# EXHIBIT A

70552392.v5

## EXCLUSIVE LICENSE AGREEMENT

This Exclusive License Agreement (this "Agreement") is made and entered into as of the date of last signature (the "Effective Date"), by and between Hill & Mac Gunworks, LLC ("HMG"), a Georgia corporation having a place of business at 3120 Engineering Parkway, Alpharetta, Georgia 30004, and True Position, Inc. ("True Position"), a Utah corporation having a place of business at 1010 West Kershaw Street, Ogden, Utah 84401. Each of HMG and True Position shall be referred to as a "Party," and collectively as the "Parties."

## RECITALS

**WHEREAS,** HMG is in the business of developing, manufacturing, and selling firearms, and owns patents and know-how related to a modernized Sturmgewehr firearm, and wishes to exclusively license certain such rights to True Position in accordance with the terms of this Agreement.

**WHEREAS,** True Position is in the business of manufacturing firearms, and wishes to obtain an exclusive license to certain HMG patents and know-how related to a modernized Sturmgewehr firearm in accordance with the terms of this Agreement.

**NOW THEREFORE,** in consideration of the foregoing and the mutual covenants and promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

As used in this Agreement, the following terms shall have the following meanings:

1.1 **Affiliate** means any entity which controls, is controlled by, or is under common control with a Party, wherein "control" means beneficial ownership (direct or indirect) of more than fifty percent (50%) of the shares of the subject entity entitled to vote in the election of directors (or, in the case of an entity that is not a corporation, for the election of the corresponding managing authority).

1.2 **Licensed Know-How** means any unpublished information and materials, whether or not proprietary and/or patentable, including but not limited to concepts, data, databases, designs, discoveries, documents, drawings, formulas, ideas, inventions, methods, plans, practices, procedures, specifications, technology, tools, trade secrets, and works of authorship related to the Licensed Products, to the extent owned or controlled by HMG.

1.3 **Licensed Patents** means all patents and patent applications listed in Appendix A of this Agreement, and any and all patent applications claiming priority to any of such patents and patent applications, all to the extent owned or controlled by HMG.

1.4 **Licensed Product** means a modernized Sturmgewehr firearm that falls within the scope of at least one claim of the Licensed Patents.

EXCLUSIVE LICENSE AGREEMENT                                                    CONFIDENTIAL

1.5   **Net Sales** means the gross amount received by HMG on sales of Licensed Products by HMG to Third Parties, less the following reasonable deductions:

    (a)   customary trade, cash and quantity discounts actually given, coupons for price reductions actually taken, and amounts repaid or credited by reason of product rejection, return or retroactive price reduction;

    (b)   price adjustments, allowances, credits, fee reimbursements, chargeback payments and rebates (or the equivalent thereof) for the Licensed Products granted to or actually used by group purchasing organizations;

    (c)   sales taxes, value-added taxes, excise taxes, tariffs and duties, and other taxes and government charges directly related to the sale of Licensed Products.

1.6   **Specifications** means a detailed description of a Licensed Product suitable for commercial sale as jointly determined through good faith efforts by the Parties, including but not limited to technical qualifications, labeling and patent marking information.

1.7   **Territory** means North America.

1.8   **Third Party** means any person or entity other than a Party or any of its Affiliates or their respective employees.

## ARTICLE II
## REPRESENTATIONS

2.1   HMG is the owner of the entire right, title and interest in the Licensed Patents, and in the inventions described and claimed therein, and the Licensed Know-How; and HMG has the authority to grant licenses under the Licensed Patents and Licensed Know-How.

2.2   True Position is a "small entity" as defined under 37 C.F.R. §1.27(a).

## ARTICLE III
## GRANT OF RIGHTS

3.1   HMG hereby grants to True Position, and True Position hereby accepts, an exclusive, royalty-bearing license under the Licensed Patents and Licensed Know-How to manufacture the Licensed Products in the Territory in accordance with the terms of this Agreement and to sell the Licensed Products to HMG only.

3.2   **Retained Rights.** Any rights of HMG not expressly granted to True Position under this Agreement shall be retained by HMG, including but not limited to rights to make, use, sell, offer for sale, import, export, research, develop, improve, market, distribute, and commercialize Licensed Products in the Territory.

3.3   **Exclusivity.** During the term of this Agreement, the Parties will not, directly or indirectly, enter into a collaboration, agreement, or license with any Third Party in

CONFIDENTIAL

connection with the design, development, manufacture, or commercialization of a modernized Sturmgewehr firearm in the Territory.

## ARTICLE IV
## MANUFACTURING AND COMMERCIALIZATION

4.1   During the term of this Agreement and as directed by HMG, True Position shall manufacture, label, store, package, and distribute Licensed Products that meet Specifications in accordance and compliance with good manufacturing practices prevailing in the industry.

4.2   True Position shall have the sole responsibility and obligation for the cost of manufacturing, labeling, storing, packaging, and distributing Licensed Products under this Agreement.

4.3   During the term of this Agreement, HMG shall use reasonable efforts to market, commercialize and obtain purchase orders for Licensed Products in the Territory.

4.4   HMG shall provide True Position with reasonable notice of required inventory projected for commercial sale and distribution of Licensed Products; and True Position shall schedule production and order materials to meet such projections.

    (a)   **HMG Components/Parts**: Notwithstanding the foregoing, True Position shall purchase from HMG all components and/or parts listed in Appendix B of this Agreement, which are useful for manufacturing Licensed Products, in the indicated units and at the indicated prices before True Position may purchase any new equivalent components and/or parts for manufacturing Licensed Products.

4.5   True Position will use reasonable efforts to manufacture and deliver Licensed Products that meet the Specifications in accordance with the quantities and delivery dates specified by HMG. To the extent possible, True Position will promptly notify HMG in writing of any anticipated delay at least ten (10) days before HMG's originally specified delivery date.

4.6   For quality review, True Position shall send to HMG a representative sample of a Licensed Product within two months after the Effective Date and subsequently thereafter during the first half of each calendar year.

4.7   True Position shall make any filings and take any actions as required to qualify to do business under all applicable laws and regulations.

4.8   **Insurance**. True Position shall maintain commercial general liability insurance (including products liability and contractual liability), with limits of not less than $2,000,000 USD combined single limit, for bodily injury or death to any person or persons and loss or damage to any property. Such insurance shall be written by an insurance carrier reasonably acceptable to both Parties and shall name HMG as an additional insured. Its terms and conditions shall not be materially changed, altered (unless to increase coverage) or canceled until ten (10) days after termination of this

EXCLUSIVE LICENSE AGREEMENT                                        CONFIDENTIAL

Agreement; provided, however, that in the event of True Position's cancellation of insurance, True Position shall obtain tail coverage suitable to HMG. A certificate of such insurance coverage shall be furnished to the HMG upon execution of this Agreement and thereafter upon request.

4.9   **Technology Transfer**. HMG shall provide reasonable assistance to transfer to True Position the Licensed Know-How and other technical expertise necessary for the manufacture of Licensed Products. During the first six (6) months after the Effective Date, HMG will provide reasonable advice and training to True Position, including making qualified personnel of HMG available, at no additional cost to True Position (other than reimbursement of reasonable travel-related expenses) in order to assist True Position in its understanding and use of the Licensed Know-How. True Position will request assistance in such a way as to minimize disruption to the operations of HMG and the day-to-day responsibilities and activities of HMG personnel, including by (i) accepting assistance by telephone where practical, (ii) giving reasonable notice when in person assistance is required, and minimizing the in-person trips to occasional trips of short duration during regular business hours, and (iii) devoting a sufficient number of True Position personnel, with the requisite expertise, to the technology transfer and manufacturing activities contemplated by this Agreement.

## ARTICLE V
## ROYALTIES AND OTHER PAYMENTS

5.1   **Running Royalty**. During the term of this Agreement, HMG shall pay to True Position a royalty of fifty percent (50%) of all Net Sales.

5.2   **Royalty Reporting**. Within thirty (30) days after each calendar quarter ending March 31, June 30, September 30, and December 31, HMG shall submit to True Position a Quarterly Royalty Report that sets forth the amount of Net Sales and the amount of royalty due thereon for the corresponding quarterly period. All Royalty Reports shall be maintained in confidence by True Position unless otherwise required by law.

5.3   **Royalty Payment**. HMG shall pay to True Position concurrently with the submission of each Quarterly Royalty Report the amount of royalty due with respect to such quarterly period. All payments due hereunder shall be deemed received when funds are credited to the receiving Party's bank account and shall be paid by check or wire transfer in U.S. dollars.

5.4   **Excise Tax**. HMG shall pay Federal Excise Tax on a quarterly basis before any royalty or profit-sharing payment occurs. The Constructive Sales Price which is taxable will be based on the highest wholesale price for each rifle sold. The Constructive Sales Price shall be applied toward wholesale, retailer and direct consumer sales per IRS and TTB regulations.

5.5   **Record Keeping**: HMG shall keep accurate records of Licensed Products sold under this Agreement, appropriate to determine the amount of royalties due to True Position hereunder. Such records shall be available during normal business hours for examination

EXCLUSIVE LICENSE AGREEMENT                                    **CONFIDENTIAL**

by an accountant selected by True Position for the sole purpose of verifying reports and payments hereunder. True Position's accountant shall not disclose to True Position any information other than information relating to the accuracy of reports and payments made hereunder unless required by law, regulation or pursuant to court order. Such examination by True Position's accountant shall be at True Position's sole expense.

## ARTICLE VI
## INTELLECTUAL PROPERTY

6.1   HMG shall be solely responsible for the prosecution and maintenance of all Licensed Patents.

6.2   True Position shall immediately inform HMG if True Position ceases to qualify as a "small entity" as defined under 37 C.F.R. §1.27(a).

6.3   **Inventions**. Any and all inventions and intellectual property developed by either Party or both Parties and completed after the Effective Date in connection with activities related to the manufacturing and development of modernized Sturmgewehr firearms ("Inventions") shall be the sole property of HMG.

   (a)   HMG shall, at its own discretion and its own expense, prepare, file, prosecute, and maintain intellectual property rights of any kind (e.g., patents, trademarks, copyrights, trade secrets, etc.) related to any such Inventions.

   (b)   True Position shall cooperate fully in the prosecution and maintenance of any intellectual property related to any such Inventions, including but not limited to executing all papers and instruments or requiring employees of True Position or its Affiliates to execute such papers and instruments so as to enable HMG to prosecute and maintain intellectual property related to any such Inventions.

   (c)   True Position agrees to assign, and hereby assigns, to HMG all rights in and to all intellectual property of any kind related to any such Inventions.

## ARTICLE VII
## CONFIDENTIALITY

7.1   **Definition**. "Confidential Information" means all Licensed Know-How, trade secrets, or other proprietary or confidential information, including any proprietary or confidential data and materials (whether or not patentable or protectable as a trade secret), regarding a Party's technology, products or business, that is disclosed by one Party to the other in relation to this Agreement, including the terms and conditions of this Agreement. However, Confidential Information shall not include any of the foregoing that:

   (a)   was known by the receiving Party prior to its date of disclosure to the receiving Party as shown by the receiving Party's written records;

EmS

(b)    either before or after the date of the disclosure to the receiving Party is lawfully disclosed to the receiving Party by a Third Party not in violation of any obligation to the disclosing Party of which the receiving Party is aware after due inquiry;

(c)    either before or after the date of the disclosure to the receiving Party becomes published or generally known to the public through no fault or omission on the part of the receiving Party; or

(d)    is independently developed by or for the receiving Party without reference to or reliance upon the Confidential Information as demonstrated by contemporaneous written records of the receiving Party.

7.2    **Treatment of Confidential Information.** Subject to the provisions of this section, during the term of this Agreement and for a period of five (5) years thereafter, each Party shall maintain Confidential Information of the other Party in confidence, and shall not disclose, divulge or otherwise communicate such Confidential Information to others or use it for any purpose other than permitted in this Agreement, and each Party agrees to exercise reasonable efforts to prevent and restrain the unauthorized disclosure of such Confidential Information by any of its directors, officers, employees, consultants, investors, financial advisors, subcontractors, licensees or agents, which reasonable efforts shall be at least as diligent as those generally used by such Party in protecting its own confidential and proprietary information.

7.3    **Right to Disclose.** To the extent it is reasonably necessary or appropriate to fulfill its obligations or exercise its rights under this Agreement, each of the Parties may disclose Confidential Information to its employees, agents, or Affiliates on a need to know basis and on the condition that any and all recipients of such information agree in writing to keep the Confidential Information confidential to the extent possible for the same time periods and to a comparable extent as the disclosing Party is required to keep the Confidential Information confidential under the terms of this Agreement.

7.4    **Return of Confidential Information.** Upon any termination of this Agreement, each Party shall promptly return to the other Party all written Confidential Information, and all copies thereof, of such other Party, except that each Party may retain one copy of such Confidential Information solely to discern its continuing obligations under this section.

7.5    **Promotional Disclosures.** True Position shall not issue any press release or public statement regarding this Agreement, and shall not use HMG's name, insignia or trademarks, or any adaptation of them, or the name of any of HMG's inventors without the prior written approval of HMG.

## ARTICLE VIII
## DISPUTE RESOLUTION

8.1    **Continuance of Rights and Obligations During Pendency of Dispute Resolution.** If there are any disputes in connection with this Agreement, including termination of this Agreement under Article IX, all rights and obligations of the Parties (including but not limited to those regarding Manufacturing and Commercialization as set forth in Article

IV) shall continue until such dispute has been resolved in accordance with the provisions of this section.

8.2   **Referral of Unresolved Matters to Senior Executives**. In the event that the Parties are unable to resolve a dispute within thirty (30) days from the date such dispute is first brought to the other Party's attention, the matter shall be immediately referred to a senior executive of each Party to be resolved by negotiation in good faith as soon as practicable but in no event later than thirty (30) days after referral. Such resolution, if any, of a referred issue by the senior executives in writing shall be final and binding on the Parties.

8.3   **Termination for Failure to Timely Resolve Dispute**. If the matter has not been resolved by the senior executives within ninety (90) days of referral under Section 8.2, this Agreement shall terminate ten (10) days after either Party provides Notice to the other Party referencing this subsection.

## ARTICLE IX
## TERM AND TERMINATION

9.1   **Term**. Unless terminated sooner pursuant to this section or Section 8.3 (Termination for Failure to Timely Resolve Dispute), this Agreement shall become effective on the Effective Date and shall continue in full force and effect for a period of one (1) year thereafter. This Agreement shall renew automatically each year for an additional period of one (1) year unless either Party provides written notice of non-renewal to the other Party at least thirty (30) days prior to the expiration of the then-current term.

9.2   HMG may terminate this Agreement as follows:

(a)   If True Position does not provide a reasonably requested amount of inventory by a deadline determined by HMG and True Position fails to cure such default within sixty (60) days of being informed by HMG, this Agreement shall terminate ten (10) days after HMG provides Notice to True Position referencing this subsection.

(b)   If True Position becomes insolvent, makes an assignment for the benefit of creditors, is declared bankrupt by a court of competent jurisdiction, makes use of any law or regulation for relief from creditors, or reorganizes or restructures in order to avoid creditors, this Agreement shall terminate immediately upon HMG providing Notice to True Position referencing this subsection.

(c)   Except as provided in Sections 9.2(a) and 9.2(b), if True Position defaults in a material respect in the performance of any obligations under this Agreement, this Agreement shall terminate sixty (60) days after HMG provides Notice of such default to True Position referencing this subsection, unless the default is remedied to HMG's satisfaction within the sixty (60) day period.

9.3   True Position may terminate this Agreement as follows:

(a)   If HMG does not provide a timely royalty payment owed under this agreement and HMG fails to cure such non-payment within sixty (60) days of being

           informed by True Position, this Agreement shall terminate ten (10) days after True Position provides Notice to HMG referencing this subsection.

    (b)    If HMG becomes insolvent, makes an assignment for the benefit of creditors, is declared bankrupt by a court of competent jurisdiction, makes use of any law or regulation for relief from creditors, or reorganizes or restructures in order to avoid creditors, this Agreement shall terminate immediately upon True Position providing Notice to HMG referencing this subsection.

    (c)    Except as provided in Sections 9.3(a) and 9.3(b), if HMG defaults in a material respect in the performance of any obligations under this Agreement, this Agreement shall terminate sixty (60) days after True Position provides Notice of such default to HMG referencing this subsection, unless the default is remedied to True Position's satisfaction within the sixty (60) day period.

9.4    **Survival of Rights**. The rights and obligations of the Parties set forth in Article VI (Intellectual Property), Article VII (Confidentiality), Section 10.7 (Indemnification by True Position), and Section 10.8 (Indemnification by HMG) of this Agreement, and all other provisions which are intended to have effect after termination of this Agreement, shall survive termination of this Agreement for the respective durations stated therein, and where no duration is stated, shall survive indefinitely.

## ARTICLE X
## MISCELLANEOUS

10.1    **Assignment**. This Agreement and the rights and duties hereunder may not be assigned by either Party without first obtaining the written consent of the other, wherein such consent shall not be unreasonably withheld.

10.2    **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which shall together be deemed to constitute one Agreement.

10.3    **Disclaimer of Warranties**. HMG EXPRESSLY DISCLAIMS ANY AND ALL IMPLIED OR EXPRESS WARRANTIES AND MAKES NO EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE LICENSED PATENTS, LICENSED KNOW-HOW OR ANY OTHER INFORMATION SUPPLIED BY HMG, OR THE LICENSED PRODUCTS CONTEMPLATED BY THIS AGREEMENT. IN NO EVENT WILL HMG BE LIABLE FOR ANY INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES RESULTING FROM EXERCISE OF THIS AGREEMENT OR USE OF THE LICENSED PRODUCTS.

10.4    **Entire Agreement**. This Agreement constitutes the entire understanding between the Parties and neither Party shall be obligated by any amendment, modifications, condition or representation other than those expressly stated herein or as may be subsequently agreed to by the Parties in writing.

EXCLUSIVE LICENSE AGREEMENT                                    **CONFIDENTIAL**

10.5    **Export Laws**. True Position shall comply with all applicable laws and regulations. In particular, it is understood and acknowledged that the transfer of certain commodities and technical data is subject to U.S. laws and regulations controlling the export of such commodities and technical data, including all Export Administration Regulations of the U.S. Department of Commerce. These laws and regulations among other things, prohibit or require a license for the export of certain types of technical data to certain specified countries. True Position hereby agrees and gives written assurance that it will comply with all U.S. laws and regulations controlling the export of commodities and technical data, that it will be solely responsible for any violation of such by True Position or its Affiliates, and that it will defend and hold HMG harmless in the event of any legal action of any nature occasioned by such violation.

10.6    **Governing Law**. This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia, without regard to choice of law principles. Any action or proceeding relating to a claim or controversy at law or equity arising from this Agreement may be brought in a federal or state court located in Georgia, in which case each Party irrevocably submits to the exclusive jurisdiction and venue of any such court in any such action or proceeding.

10.7    **Indemnification by True Position**. True Position shall indemnify, defend and hold harmless HMG and its current or former directors, staff, employees, and agents and their respective successors, heirs and assigns (collectively, "HMG's Indemnitees"), from and against any claim, liability, cost, expense, damage, deficiency, loss or obligation of any kind or nature (including, without limitation, reasonable attorney's fees and other costs and expenses of litigation) (collectively, "Claims"), based upon, arising out of, or otherwise relating to any cause of action relating to product liability concerning any product made, used or sold pursuant to any right or license granted under this Agreement, or any negligence, willful misconduct or willful omissions of True Position or any of its Affiliates in the performance of its obligations hereunder. True Position shall, at its own expense, provide attorneys reasonably acceptable to HMG to defend against any actions brought or filed against any of HMG's Indemnitees hereunder with respect to the subject of indemnity contained herein, whether or not such actions are rightfully brought.

10.8    **Indemnification by HMG**. HMG shall indemnify, defend and hold harmless True Position and its current or former directors, staff, employees, and agents and their respective successors, heirs and assigns (collectively, "True Position's Indemnitees"), from and against any Claims based upon, arising out of, or otherwise relating to any cause of action relating to any negligence, willful misconduct or willful omissions of HMG or any of its Affiliates in the performance of its obligations hereunder. HMG shall, at its own expense, provide attorneys reasonably acceptable to True Position to defend against any actions brought or filed against any of True Position's Indemnitees hereunder with respect to the subject of indemnity contained herein, whether or not such actions are rightfully brought.

10.9    **Notice**. Any Notice required hereunder shall be in writing, signed by the Party or Party's attorney, and shall be deemed to have been given to a Party if properly addressed to the corresponding address shown below. Proper Notice may be: (i) delivered in person by a

**EXCLUSIVE LICENSE AGREEMENT**                                    **CONFIDENTIAL**

courier that provides evidence of receipt of delivery, in which case Notice is deemed given on the date of delivery; (ii) mailed certified mail return receipt requested, in which case Notice is deemed given three (3) days after being sent; or (iii) e-mailed if the sender promptly sends a copy of the Notice to the recipient by certified mail return receipt requested, in which case Notice is deemed given on the date the copy is mailed.

| <u>If to HMG:</u> | <u>If to True Position:</u> |
|---|---|
| Hill & Mac Gunworks, LLC | True Position, Inc. |
| Attention: Mac Steil | Attention: Christopher Woods |
| 3120 Engineering Parkway | 1010 West Kershaw Street |
| Alpharetta, GA 30004 | Ogden, UT 84401 |
| mac@hmgunworks.com | chris@crosscanyonarms.com |

10.10   **Relationship of the Parties**. The Parties agree that their relationship established by this Agreement is that of independent contractors, and that this Agreement does not, is not intended to, and shall not be construed to, establish a partnership or joint venture, and nor shall this Agreement create or establish an employment, agency or any other relationship. Except as may be specifically provided herein, neither Party shall have any right, power or authority, nor shall they represent themselves as having any authority to assume, create or incur any expense, liability or obligation, express or implied, on behalf of the other Party, or otherwise act as an agent for the other Party for any purpose.

10.11   **Separate Counsel**. The Parties agree that they are not jointly represented by the same counsel in relation to this Agreement.

10.12   **Severability**. If a court of competent jurisdiction later holds any provision of this Agreement to be invalid, illegal, or unenforceable, and such holding is not reversed on appeal, such provision shall be considered severed from this Agreement. All other provisions, rights and obligations shall continue without regard to the severed provision.

10.13   **Waiver**. The failure of any Party at any time to enforce its rights hereunder strictly in accordance with the same shall not be construed as having created a custom contrary to the specific provisions hereof or as having in any way modified or waived same.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the indicated date.


**Hill & Mac Gunworks, LLC**                    **True Position, Inc.**

_____                    _____
Everett McDowell Steil                          Christopher Woods

1/22/2018 2019 (ams)                         1-22-2019
_____                    _____
Date                                              Date

ams

EXCLUSIVE LICENSE AGREEMENT                                    CONFIDENTIAL

## Appendix A

In accordance with Section 1.3, the following comprise Licensed Patents:

**U.S. Patent No. 9,513,074** issued December 6, 2016, entitled FIREARM WITH INTERCHANGEABLE PARTS, which was filed as U.S. Patent Application No. 14/955,114 on December 1, 2015 and claims the benefit of priority to U.S. Provisional Patent Application No. 62/169,136 filed June 1, 2015.

**U.S. Patent Application No. 15/337,214** filed October 28, 2016, entitled FIREARM WITH INTERCHANGEABLE PARTS, which is a continuation of U.S. Patent Application No. 14/955,114 filed December 1, 2015, which claims the benefit of priority to U.S. Provisional Patent Application No. 62/169,136 filed June 1, 2015.

EXCLUSIVE LICENSE AGREEMENT                                    CONFIDENTIAL

## Appendix B

In accordance with Section 4.4(a), the following comprise HMG components and/or parts for manufacturing Licensed Products:

| Description | Units | Price Per Unit |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |