## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**HILL & MAC GUNWORKS, LLC,**

**Plaintiff,**

**v.**

**TRUE POSITION, INC.**

**Defendant.**

**CIVIL ACTION FILE NO.**

**1:20-CV-02447-CC**

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF HILL & MAC GUNWORKS, LLC'S  MOTION FOR PRELIMINARY INJUNCTION AGAINST DEFENDANT TRUE POSITION, INC.

COMES NOW Plaintiff Hill & Mac Gunworks, LLC ("HMG") and hereby files this Memorandum of Law in support of its Motion for Preliminary Injunction. HMG moves this Court to restrain Defendant True Position, Inc. ("TP") from, during the pendency of this action, retaining, detaining, and/or converting machines, materials, parts, and tools that were supplied to it by HMG, and firearm products manufactured by TP and to which HMG is entitled.  The relief requested

is necessary to preserve the status quo and avoid immediate irreparable harm to HMG.

## I.     <u>INTRODUCTION</u>

This action seeks injunctive relief and damages to prevent and redress unlawful detention and conversion by TP of machines, materials, parts, tools, and firearm products (collectively, the "Property") belonging to HMG.  Attached hereto as Exhibit A is a list of the Property at issue.

As previously set forth in HMG's Complaint, this litigation arises out of an agreement to manufacture a modernized replica of a historically significant WWII-era firearm known generally as the StG 44 (the "Firearm"), which was skillfully engineered by Mac Steil of HMG to be compatible with both modern and original ammunition.  Affidavit of Everett "Mac" Steil ("Steil Aff."), ¶ 4, filed concurrently herewith.  As such, the Firearm has acquired immense appeal among firearm enthusiasts since it first debuted in January 2016 at the Shooting, Hunting, Outdoor Trade (SHOT) Show, the largest annual trade show in the firearms industry.  Steil Aff., ¶ 5.  To date, HMG has been the only company to successfully develop and market a modernized operational version of the Firearm and owns all relevant intellectual property related thereto.  Steil Aff., ¶ 6.

In order to meet growing customer demand for the Firearm, HMG entered into an Exclusive License Agreement (the "Agreement") dated January 22, 2019

with TP, an Ogden, Utah based provider of precision machining, to scale up manufacturing and production of the Firearm.  Steil Aff., ¶¶ 3 & 7.  HMG was first introduced to TP in mid-2018 through mutual contacts in the firearms industry, who identified TP as having experience in firearms manufacturing.  Steil Aff., ¶ 8.  Discussions and in-person visits between HMG and TP were then conducted through the end of 2018 and early 2019, wherein TP confirmed its purported experience in firearms manufacturing, ultimately resulting in the Agreement being executed by the parties on January 22, 2019.  Steil Aff., ¶¶ 9 & 10.

Over the next 12 months, however, it became evident that TP had grossly overestimated its abilities, telling HMG in a January 14, 2020 e-mail that TP "has incurred Research and Development costs that were unforeseen during discussions in bringing the firearm to market."  Steil Aff., ¶ 11.  TP never consulted with HMG prior to allegedly incurring these alleged expenses.  *Id*.  In that e-mail, TP also demanded radical changes to the Agreement, including significant monetary payments from HMG, before TP would produce the Firearm.  *Id*.  TP made these demands at a time when it asserted that it had hundreds of nearly complete Firearms in its possession that could have been finished and readily provided to customers, including those who had placed pre-orders for Firearms.  Steil Aff., ¶ 12.  Yet, rather than achieve a significant threshold in commercialization of the Firearm that would have generated revenue for both parties, TP instead chose to effectively hold HMG's

Property hostage in an attempt to exert pressure on HMG. Steil Aff., ¶ 13. Indeed, in early 2020, counsel for TP made the dubious claim that a "mechanic's lien" had been placed against certain of HMG's Property and that TP would not return it unless the sum of $880,000 was paid to TP. Steil Aff., ¶¶ 14 & 15. Implicit in the placement of a mechanic's lien on HMG's Property is the admission by TP that the Property does not belong to TP. Further, TP took this position and made these demands while declaring that the Agreement was null and void due to lack of consideration. *Id*. In reality, TP is not satisfied with the financial result of the Agreement, which was negotiated at arm's length by the parties, and now seeks to foist its own financial issues onto HMG.

## II.   FACTS

Section 3.1 of the Agreement provides to TP an exclusive, royalty-bearing license from HMG to manufacture the Firearm and to provide it to HMG only. Steil Aff., ¶ 16. Section 4.2 of the Agreement states that TP "shall have the sole responsibility and obligation for the cost of manufacturing, labeling, storing, packaging, and distributing [the Firearm] under the Agreement." Steil Aff., ¶ 17. Section 5.1 of the Agreement sets forth that TP is to be paid "a royalty of fifty percent (50%) of all Net Sales" made by HMG. Steil Aff., ¶ 18. Section 4.9 of the Agreement, entitled "Technology Transfer," makes clear HMG's principle obligation:

> HMG shall provide reasonable assistance to transfer to True Position the Licensed Know-How and other technical expertise necessary for the manufacture of Licensed Products. During the first six (6) months after the Effective Date, HMG will provide reasonable advice and training to True Position, including making qualified personnel of HMG available, at no additional cost to True Position (other than reimbursement of reasonable travel-related expenses) in order to assist True Position in its understanding and use of the Licensed Know-How. True Position will request assistance in such a way as to minimize disruption to the operations of HMG and the day-to-day responsibilities and activities of HMG personnel, including by (i) accepting assistance by telephone where practical, (ii) giving reasonable notice when in person assistance is required, and minimizing the in-person trips to occasional trips of short duration during regular business hours, and (iii) devoting a sufficient number of True Position personnel, with the requisite expertise, to the technology transfer and manufacturing activities contemplated by this Agreement.

Steil Aff., ¶ 19.

Prior to or concurrently with entering into the Agreement, TP made several representations. These representations include that TP personnel had reviewed the specifications for the Firearm and, given appropriate machines, materials, tools, and training, could manufacture the Firearm. Steil Aff., ¶¶ 20. TP impliedly represented and assumed the obligation implied by law that it would undertake commercially reasonable efforts and diligence to manufacture the Firearm.

Since HMG entered into the Agreement with TP, HMG has made every effort to provide TP with whatever resources and/or support TP requested or which made itself apparent to HMG, including extensive technical support, in-person demonstrations at TP's facility, and training, as well as financial support. Steil Aff.,

¶ 21.  Since HMG entered into the Agreement with TP, HMG has shipped and supplied HMG-owned machines, materials, tools, and parts to TP.  Steil Aff., ¶ 22. Indeed, Mac Steil, a co-owner of HMG, the inventor of the Firearm, and a resident of Georgia, visited TP's Utah facility on three separate occasions (along with other employees of HMG) and transferred "Licensed Know-How" and provided in-person technical assistance to TP on a total of 18 days beginning in the fall of 2018 through December of 2019, including nine days during July of 2019 and another four days during December of 2019.  Steil Aff., ¶ 23.  HMG even arranged for a representative of another manufacturer to visit TP in further support of this effort.  Steil Aff., ¶ 24.

In reasonable reliance on the Agreement and the representations of TP, HMG continued to accept "pre-orders" for Firearms from customers, ultimately "pre-selling" 671 Firearms prior to this dispute.  Steil Aff., ¶ 24.  As a result, HMG received more than $1.2 million in funds from customers for the purchase of Firearms prior to the actual manufacture of the Firearms.  Steil Aff., ¶ 25.  On or about October 11, 2018, HMG issued a purchase order (PO# 10451) to TP ordering 500 Firearms from TP. Steil Aff., ¶ 26.  But TP never manufactured the 500 Firearms ordered by HMG.  Steil Aff., ¶ 27.

Section 4.6 of the Agreement states, "For quality review, True Position shall send to HMG a representative sample of a Licensed Product within two months after the Effective Date and subsequently thereafter during the first half of each calendar

year." Steil Aff., ¶ 28.  HMG did not receive any Firearm samples from TP within two months of the Effective Date (March 22, 2019).  Steil Aff., ¶ 29.  As of the date of the filing of this Memorandum, HMG has not received any completed Firearms from TP, and has received parts from TP that have only permitted HMG to fully assemble three Firearms.  Steil Aff., ¶ 30.

It is critical that HMG be able to provide Firearms to meet customer demand, particularly, the present and immediate demand represented by numerous customers of HMG who pre-ordered Firearms more than a year ago.  Steil Aff., ¶ 31.  But instead of complying with the Agreement to meet this demand by manufacturing the Firearms ordered by HMG, on or about January 13, 2020, the President of TP, Christopher Woods, demanded several "contract changes."  Steil Aff., ¶ 32.  TP's demanded contract changes represent a "Dispute" between TP and HMG as that term is utilized in the Agreement.  Steil Aff., ¶ 33.  As such, the January 13, 2020 conversation between Christopher Woods (President of TP) and Mac Steil (Co-Owner of HMG) began a 90-day time period for Dispute Resolution pursuant to Section 8.3 of the Agreement.  *Id.*

On January 14, 2020, TP provided to HMG a written summary of its demanded "contract changes."  Steil Aff., ¶ 34.  In summary, these included: (1) several changes that would shift to HMG the burdens of the cost of manufacturing, obtaining parts, inventory, recoupment of labor costs, and associated market price

variability, from TP despite the plain language of Section 4.2 stating otherwise; (2) claims by TP that it incurred unspecified research and development costs and that it wanted to be paid, separate and apart from the terms of the Agreement, for certain Firearms it produced, whereby TP intended to use such payments to offset other amounts it owed to HMG for the provision of certain Property by HMG necessary for TP's production of the Firearms; (3) changes to the royalty payments timeline to make them due on a Net 30 basis instead of quarterly; (4) the assertion that HMG-provided materials needed "changes," which is untrue, and, instead, is a result of TP's incompetence, thereby creating an issue that does not exist; (5) the requirement that HMG pay for mistakes in manufacturing made by TP and simultaneously warranty TP's work; and (6) perhaps most tellingly, TP's demand that if HMG somehow "defaults," then TP would "assume all ownership of patents and licensing agreements of [the Firearm] and TP will be the sole owner of them."  Steil Aff., ¶ 35.

Subsequently, over the ensuing weeks principles of the parties had several conversations and exchanges of correspondence in an attempt to resolve the foregoing issues as detailed in the Affidavit of Mr. Steil.  Steil Aff., ¶¶ 36 – 44.

During the course of discussions between TP and HMG regarding TP's demanded contract changes, TP informed HMG that it was fully capable of manufacturing and providing the 500 Firearms previously ordered by HMG.  Steil

Aff., ¶ 44. Nonetheless, TP has failed and refused to do so. Steil Aff., ¶ 45. Moreover, TP has refused to return to HMG the Property HMG would need in order to manufacture Firearms itself, thereby creating a devastating stalemate situation. Steil Aff., ¶ 46.

On February 10, 2020, HMG notified TP that the 90-day time period for Dispute Resolution pursuant to Section 8.3 of the Agreement had begun to run as of January 13, 2020. Steil Aff., ¶ 38. HMG further notified TP that if TP did not provide the requested inventory of completed firearms to HMG, suitable for commercial sale, by the end of the 90-day period (April 12, 2020), the dispute would remain unresolved and the Agreement would be terminable pursuant to Articles VIII and/or IX of the Agreement. Steil Aff., ¶ 39.

On February 26, 2020, after further discussion between the parties, HMG sent a proposed Termination Agreement to TP in an effort to reach an amicable parting of the ways whereby HMG could retrieve the Property and, in exchange, HMG would purchase any and all completed Firearms and usable Firearm components in the possession of TP. Steil Aff., ¶ 40. Despite HMG's best efforts, it was unable to negotiate a resolution with TP and, at HMG's suggestion, the parties agreed to mediate their dispute. Steil Aff., ¶¶ 47 & 48. Although HMG proposed and was ready to immediately enter into mediation in mid-March 2020, TP insisted on

delaying until May 2020 to begin.  Hence, the mediation was conducted over two days, starting on May 5, 2020 and ending on May 14, 2020.  *Id.*

On May 4, 2020, the day before the mediation began, TP's counsel unexpectedly sent HMG's counsel an e-mail with a link to a publicly available 24-minute video posted by TP on www.vimeo.com, and stated that the "video demonstrates some of the problems we are trying to describe and should be helpful in understanding the case."  Steil Aff., ¶ 49.  In this video, Christopher Woods (President of TP) and another TP employee each provide a detailed description of critical and confidential features of the Firearm design as well as details of confidential communications and interactions that occurred between the parties prior to and during the term of the Agreement.  Steil Aff., ¶ 50.  By making this video publicly available and without HMG's consent, TP expressly breached the confidentiality provisions of the Agreement, including Section 7.5 which states, "True Position shall not issue any press release or public statement regarding this Agreement, and shall not use HMG's name, insignia or trademarks, or any adaptation of them, or the name of any of HMG's inventors without the prior written approval of HMG."  Steil Aff., ¶ 51.  HMG never provided prior written approval for TP to create and release the video.  Steil Aff., ¶ 52.

The mediation failed to resolve the issues between the parties. Steil Aff., ¶ 53.

On May 26, 2020, pursuant to Section 8.3 of the Agreement, HMG provided TP with a formal "Notice of Termination."  Steil Aff., ¶ 54.

Based upon TP's failure and refusal to produce the agreed-upon units and quality of the Firearm, and pursuant to the express terms of Section 8.3 of the Agreement, HMG terminated the Agreement effective June 5, 2020 and this litigation followed.  Subsequent to the filing of this suit, and before filing its Answer and Counterclaim, on July 7, 2020 counsel for TP sent a letter to counsel for HMG demanding that HMG pick up certain machines and raw materials located at its Ogden, Utah facility and threatening to charge HMG for warehousing and storing these items if they were not picked up within ten days.  Steil Aff., ¶ 60.  Here again, TP has effectively admitted that it is holding Property belonging to HMG.  An obvious problem, of course, with TP's demand is that it specifically excludes the "custom dies" associated with some of the machines.  The "custom dies," as that term is used by TP's counsel, refers to critical tooling specifically designed to be utilized in concert with key machines to produce the Firearm.  Consequently, TP's "demand" is nothing more than an offer for HMG to pay tens of thousands of dollars to obtain, pack, and ship, from Utah to Georgia, several tons of heavy equipment and raw materials for which it would have very little use without the critical tools, not to mention the hundreds of other parts owned by HMG and in TP's possession, that are needed to manufacture the Firearm.  As such, even if HMG were to comply

with TP's demand, it would be left in an even worse position – still unable to manufacture the Firearm yet having spent tens of thousands of dollars. Steil Aff., ¶¶ 61 – 63.  Hence, TP's "demand" appears to be nothing more than a transparent attempt to create a false argument that HMG refuses to pick up its property.

### III.  ARGUMENT AND CITATION OF AUTHORITY

The parties dispute certain outstanding issues between themselves as more fully set forth in HMG's Complaint, which can adequately be addressed at trial. However, TP has unlawfully retained, detained, and converted Property belonging to HMG, all in an effort to seek concessions from HMG relating to their contractual and other disputes.  TP's failure, refusal, and/or inability to produce the Firearms as agreed by the parties and TP's actions in illegally detaining and converting HMG's Property have already had dire consequences for HMG's business as customers with standing pre-orders continue to request and receive refunds due to the aforementioned manufacturing delays.  Steil Aff., ¶ 56.  TP's continued unlawful retainer, detention, and conversion of the Property risks immediate and irreparable harm to HMG, particularly if HMG becomes "known" as an unreliable producer and supplier of custom firearms in the eyes of its customers and the marketplace.  Steil Aff., ¶ 59.  Such action by TP is also prohibited by Georgia state law, which expressly controls the parties' relationship pursuant to Section 10.6 of the Agreement.

A.     **Legal Standard.**

To obtain injunctive relief, HMG must establish that: (1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable injury if the relief is not granted; (3) the threatened injury outweighs the harm the relief may inflict on the Defendant; and (4) entry of relief would not be adverse to the public interest. *See Bloedorn v. Grube,* 631 F.3d 1218, 1229 (11th Cir. 2011) (internal citations omitted). The purpose of a preliminary injunction is to preserve the positions of the parties as best this Court can until a trial on the merits may be held. *Id.* at 1229 (*citing Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981)).  HMG meets each of these requirements and is entitled to immediate relief enjoining TP's blatant disregard for its obligations under the law.

B.     **HMG Is Likely To Succeed On The Merits Of Its Claims Against TP.**

(i)     **Count I: Breach of Contract – Failure to Manufacture Firearms.**

The Agreement is controlled by Georgia law.  Agreement, Section 10.6. The elements for a breach of contract claim under Georgia law are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken. *Roberts v. JP Morgan Chase Bank, National Assoc'n*, 802 S.E.2d 880, 884 (Ga. App. 2017).

TP's actions in failing and refusing to manufacture and supply to HMG the Firearms ordered by HMG breach the clear terms of the Agreement.  TP has

further breached its obligation to undertake in a commercially reasonable manner to manufacture the Firearm.  These breaches have caused damage to HMG.

Given the clear terms of Sections 3.1, 4.2, & 5.1 of the Agreement, HMG is likely to succeed on the merits of Count I at trial.

### (ii)     Count II: Breach of Contract – Breach of Confidentiality.

Section 7.5 of the Agreement states, "Promotional Disclosures. True Position shall not issue any press release or public statement regarding this Agreement, and shall not use HMG's name, insignia or trademarks, or any adaptation of them, or the name of any of HMG's inventors without the prior written approval of HMG."

On May 4, 2020, TP posted a publicly available video on the website www.vimeo.com without HMG's knowledge, approval, or consent.  In this 24-minute video, Christopher Woods (President of TP) and another TP employee each provide a detailed description of critical and confidential features of the Firearm design as well as details and characterizations of communications and interactions that occurred between the parties prior to and during the term of the Agreement.

By making this video publicly available, TP expressly breached the confidentiality provisions of the Agreement and HMG is likely to succeed on the merits of Count II at trial. To the extent that any member of the public viewed the video, HMG's reputation has been damaged.

### (iii)    Count III: Promissory Estoppel

In Georgia, to prevail on a claim for promissory estoppel, a plaintiff must show "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee … and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." O.C.G.A. § 13-3-44. Here, TP has taken the position that the Agreement is unenforceable. Steil Aff., ¶ 15. HMG disagrees, but, in any case, TP nonetheless represented and/or promised that it could and would produce Firearms in quantities sufficient to meet HMG's customers' demands. Steil Aff., ¶¶ 3, 4, 10, 12, 16 – 18, 20. TP should have reasonably expected HMG to rely on such promise, take action based on such promise, and forbear from other action based on such promise. HMG did, in fact, rely on, take action on, and forbear from other action based on TP's promise to its detriment and, thus, injustice can be avoided only by compensation for the harm caused by HMG's detrimental reliance. For example, HMG: (1) ceased any and all efforts to manufacture the Firearm itself; (2) ceased making efforts to find other manufacturers to contract with to make the Firearm in accordance with the exclusive provisions of the Agreement; (3) continued to pre-sell Firearms to interested customers based on entering into the Agreement; and (4) spent nearly one million dollars to ship, purchase, and/or have delivered scores of machines, materials, parts, and tools to TP for the express purpose of manufacturing the Firearm. Steil Aff., ¶ 64.

As such, HMG is likely to succeed on the merits of Count III at trial.

### (iv)   Count IV: Alternative Claim for Quantum Meruit/Valebant and/or Unjust Enrichment.

Under Georgia law, to state a claim for quantum meruit, a plaintiff must show "(1) the performance of valuable services; (2) accepted by the recipient or at his request; (3) the failure to compensate the provider would be unjust; and (4) the provider expected compensation at the time services were rendered." *Amend v. 485 Props.*, 627 S.E.2d 565, 567 (Ga. 2006). An unjust enrichment claim arises when the plaintiff confers a benefit on the defendant for which the plaintiff should be equitably compensated. *City of Atlanta v. Hotels.com*, 710 S.E.2d 766, 771 (Ga. 2011).

While HMG is aware that claims for quantum meruit/valebant and/or unjust enrichment will not lie when there is an express contract, TP has taken the position that the parties have no Agreement.  Steil Aff., ¶ 15. HMG disputes TP's position. Nevertheless, HMG provided both Property and training at the request of TP, TP accepted them, and they are valuable to TP.  As is made clear by the Agreement, HMG expects to earn money – to be paid – as a result of the provision of its Property and training to TP.  As a consequence, TP has been enriched at the expense of HMG to the extent it has not compensated HMG for the Property and training provided by HMG.  As such, TP is obligated in quantum meruit/valebant to pay HMG the reasonable value of the Property and training provided by HMG.  Alternatively, TP

is obligated to pay HMG the reasonable value of the Property and training to prevent it from being unjustly enriched.

As such, HMG is likely to succeed on the merits of Count IV at trial.

**(v)    Count V: Breach of Implied Promise Not to Interfere with Performance of Contract.**

The elements of a claim for interference with contract in Georgia are: (1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff. *Slosberg v. Giller,* 801 S.E.2d 332, 335 (Ga. App. 2017). As to the first element, to be "without privilege" means that the defendant is a stranger to the contract or business relationship. *Id.* As to the second element, the term "malice" encompasses any act on the part of the defendant which constitutes unauthorized interference or interference without legal justification or excuse. *Id.*

TP is a stranger to HMG's contracts with its customers. TP's retainer, detention, and conversion of HMG's Property is prohibited by Georgia law. TP knowingly retained HMG's Property to exert pressure on HMG vis-à-vis HMG's contracts with its customers for the provision of the Firearms in an effort to extract concessions and substantial monetary payments related to a contract dispute

between HMG and TP.  In other words, TP acted with malice by forcing HMG to "choose between the devil and the deep blue sea."  In essence, HMG could stand its ground regarding the disputes at issue with TP and risk further delayed performance on its contracts with its customers, or accede to TP's outrageous and baseless demands.  TP's actions have already caused delays in delivery of the Firearms contrary to TP's obligations under the Agreement, in a manner causing direct damage to HMG's reputation, and causing many of HMG's customers to rescind their contracts for purchase of Firearms, resulting in HMG issuing hundreds of thousands of dollars' worth of refunds.  Steil Aff., ¶¶ 56 – 57.

As such, HMG is likely to succeed on the merits of Count V at trial.

**(vi) Count VI: Negligent Misrepresentation.**

The elements of a negligent misrepresentation claim are: "(1) the defendant's negligent supply of false information to foreseeable persons, known or unknown; (2) such persons' reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance."  *Smiley v. S & J Investments*, 580 S.E.2d 283, 288 (Ga. App. 2003).  TP was introduced to HMG as a capable partner in manufacturing the Firearms and TP has undeviatingly claimed as much in its interactions with HMG.  Steil Aff., ¶ 8 – 10.  TP represented and/or promised that it could and would produce Firearms in quantities sufficient to meet HMG's customers' demands.  Steil Aff., ¶¶ 3, 4, 10, 12, 16 – 18, 20.  TP should

have reasonably expected HMG to rely on such promise, take action based on such promise, and forbear from other action based on such promise. HMG did, in fact, rely on, take action on, and forbear from other action based on TP's promise to its detriment and, thus, injustice can be avoided only by compensation for the harm caused by HMG's detrimental reliance. For example, HMG: (1) ceased any and all efforts to manufacture the Firearm itself; (2) ceased making efforts to find other manufacturers to contract with to make the Firearm in accordance with the exclusive provisions of the Agreement; (3) continued to pre-sell Firearms to interested customers based on entering into the Agreement; and (4) spent nearly one million dollars to ship, purchase, and/or have delivered scores of machines, materials, parts, and tools to TP for the express purpose of manufacturing the Firearm. Steil Aff., ¶ 64.

As such, HMG is likely to succeed on the merits of Count VI at trial.

**(vii) Count VII: Conversion.**

To establish a prima facie case for conversion under Georgia law, a "plaintiff is required to show title to the property or the right of possession, actual possession in defendant, demand for its return, and defendant's refusal." *Hooks v. Cobb Ctr. Pawn & Jewelry Brokers, Inc.,* 527 S.E.2d 566, 569 (Ga. App. 1999). "Any distinct act of dominion wrongfully asserted over another's property in denial of his right, or inconsistent with it, is a conversion." *Mitzner v. Hyman,* 333

S.E.2d 182, 183 (Ga. App. 1985) (citing James v. Newman, 35 S.E.2d 581 (Ga. App. 1945). HMG owns the machines, materials, tools, and parts that it shipped and/or supplied to TP. Steil Aff., ¶¶ 22. Likewise, pursuant to the Agreement, HMG is entitled to whatever Firearms products have been manufactured by TP. HMG has repeatedly demanded the return of its machines, materials, tools and parts (and/or access to obtain them) and has ordered 500 Firearms from HMG. Steil Aff., ¶¶ 26 & 58. TP has not only failed and refused to return the HMG Property, including HMG's machines and corresponding tooling needed to manufacture Firearms, but TP also purports to have placed a "mechanic's lien" on HMG's "parts and equipment" and has further threatened to charge HMG a fee for storage of HMG's machines and raw materials. Steil Aff., ¶ 14. The detainer and retention of Property belonging to HMG is a tortious act of conversion as a matter of Georgia law.

As such, HMG is likely to succeed on the merits of Count VII at trial.

**(viii) Count VIII: Injunctive Relief.**

Count VIII of HMG's Complaint seeks the preliminary injunction forming the basis of this Motion. For the reasons explained herein, HMG is entitled to preliminary injunctive relief to prevent further irreparable harm during the pendency of this action.

**(ix) Count IX: Punitive Damages.**

In order to prevail on its claim for punitive damages, HMG will have to show that the actions taken by TP show willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to their consequences in accordance with O.C.G.A. § 51-12-5.1.  Based on the foregoing, HMG is able to show that TP's actions meet the standard for the imposition of punitive damages.  As such, HMG is likely to succeed on the merits of Count IX at trial.

**(x) Count X: Attorney's Fees and Costs.**

HMG is entitled to recover its reasonable expenses of litigation, including attorney's fees pursuant to O.C.G.A. § 13-6-11.  TP has continued its retention, detention, and conversion of HMG's Property in flagrant disregard of Georgia law. These actions have forced HMG to seek the assistance and protection of this Court, notwithstanding HMG's previous good faith efforts to terminate and wind down the parties' business relationship and mediate their dispute s.

As such, HMG is likely to succeed on the merits of Count X at trial.

**C.     HMG Requires Immediate Preliminary Injunctive Relief To Prevent Immediate, Long-Lasting And Irreparable Harm.**

HMG will suffer immediate and irreparable injury, loss, and damage should this Court refuse preliminary injunctive relief, enjoining TP from retaining, detaining, and converting HMG's Property during the pendency of this action. TP's actions demonstrate that it intends to hold hostage HMG's Property so as to

exert pressure in connection with disputes between the parties.  HMG's reputation as a reliable seller of Firearms is paramount to its continued success in the industry.  If HMG is scarred in the eyes of its customers and the marketplace as an entity that cannot be relied upon to make timely delivery of Firearms due to the whims of a machine shop, HMG will suffer irreparable injury.

The Eleventh Circuit recognizes that the threat of reputational injury is the type of injury that supports issuance of preliminary injunctive relief precisely because it is so difficult to recover from once inflicted and is therefore incapable of complete remuneration via pecuniary relief.  *See, e.g., Boulan S. Beach Master Ass'n, Inc. v. Think Properties, LLC,* 617 F. App'x 931, 934 (11th Cir. 2015) (district court abused its discretion in denying preliminary injunction given potential for confusion or reputational harm based on alleged trademark infringement); *Ferrellgas Partners, L.P. v. Barrow,* 143 F. App'x 180, 190-91 (11th Cir. 2005) ("[G]rounds for irreparable injury include loss of control of reputation, loss of trade, and loss of good will . . . .").

The present detention, retention, and conversion of HMG's property has thoroughly disrupted the ability of HMG to supply Firearms to its customers.  If TP is permitted to indefinitely retain HMG's property, HMG's business will be irreparably harmed because HMG will be unable to provide Firearms to its customers (hundreds of whom have pre-ordered and pre-paid for the Firearm), and

HMG will be forever known as an unreliable seller in the industry.  Current and future customers will undoubtedly seek other sources for firearm products and HMG will be "out of business."  Accordingly, HMG requires immediate preliminary injunctive relief, enjoining TP from any further retention, detention, or conversion of its Property.

### D. The Balance Of Hardships Strongly Favors HMG.

The harm to HMG if an injunction is not issued immediately outweighs the harm to TP.  If an injunction is not issued by this Court, HMG stands to incur mounting irreparable reputational injury and loss of goodwill, which risks its customer base.  As the foregoing Eleventh Circuit authority demonstrates, this is precisely the type of irreparable harm an injunction stands to prevent.  By contrast, TP does not stand to lose anything by simply returning (or allowing HMG to collect) the Property belonging to HMG.  TP has made it clear that it cannot and/or will not produce finished Firearms and has no use for HMG's machines, materials, parts, and tools, which are specifically designed for manufacturing the Firearm. Moreover, TP has expressly demanded that a portion of HMG's Property be removed from its Utah facility. There is, therefore, no legitimate purpose served by continuing to retain and detain HMG's Property.  The commercial disputes between the parties are capable of being resolved through this action or through further negotiation.  Under no circumstances, however, should HMG be required to

negotiate while its Property is held by TP and the threat to its customers' interests and the resultant effect on HMG's reputation is used as a sword against it.

### E.   Granting The Requested Injunctive Relief Would Advance The Public Interest.

Denial of the requested injunctive relief will merely serve to incentivize and encourage TP's bad behavior in holding hostage HMG's Property.  By contrast, granting the requested preliminary injunction would advance the public interest by deterring this type of disruptive and bad faith self-help tactic. Furthermore, the injunction would promote the efficient and orderly conduct of trade and would benefit HMG's innocent customers.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff Hill & Mac Gunworks, LLC respectfully requests that this Court grant the Motion in its entirety.

This 20th day of July, 2020.

**FOX ROTHSCHILD LLP**
999 Peachtree Street
Suite 1500                                  */s/ Steven D. Henry*
Atlanta, GA  30309                      Steven D. Henry
Telephone:  404-962-1000          Georgia Bar No. 348040
Facsimile:   404-962-1200           G. Marshall Kent, Jr.
shenry@foxrothschild.com          Georgia Bar No. 415129
mkent@foxrothschild.com

                                                  *Attorneys for Plaintiff Hill & Mac*
                                                  *Gunworks, LLC*

## <u>CERTIFICATE OF SERVICE AND TYPE SIZE COMPLIANCE</u>

Pursuant to Local Rule 5.1B, NDGa., the foregoing pleading was prepared in Times New Roman, 14 point, was filed electronically with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to the following attorneys of record:

John Michael Webster
Bartlett & Webster, LC
5093 South 1500 West
Riverdale, UT 84405

Dean R. Fuchs
Schulten Ward Turner & Weiss LLP
Suite 2700
260 Peachtree Street, N.W.
Atlanta, GA 30303

David Lawrence Turner
Schulten Ward Turner & Weiss LLP
Suite 2700
260 Peachtree Street, N.W.
Atlanta, GA 30303

This 20th day of July, 2020.

**FOX ROTHSCHILD LLP**
999 Peachtree Street
Suite 1500                                  */s/ Steven D. Henry*
Atlanta, GA  30309                          Steven D. Henry
Telephone:  404-962-1000                    Georgia Bar No. 348040
Facsimile:  404-962-1200                    G. Marshall Kent, Jr.
shenry@foxrothschild.com                    Georgia Bar No. 415129
mkent@foxrothschild.com

                                           *Attorneys for Plaintiff Hill & Mac*
                                           *Gunworks, LLC*