## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

HILL & MAC GUNWORKS, LLC,

     Plaintiff,

              v.

TRUE POSITION, INC.,

     Defendant.

Civil Action No.
1:20-cv-02447-SDG

### <u>OPINION AND ORDER</u>

This matter is before the Court on Plaintiff Hill & Mac Gunworks, LLC's (HMG) Motion for Partial Summary Judgment [ECF 83] and Motion to Strike the Declaration of Chris Woods and to Exclude Hearsay Testimony [ECF 106], as well as Defendant True Position, Inc.'s (TP) Motion for Summary Judgment [ECF 104], Motion to Strike and Objection to Plaintiff's "Reply In Support of Its Statement of Undisputed Material Facts" [ECF 103], and Objections to the Declarations of Everett "Mac" Steil and Hill Redwine [ECF 116]. For the reasons stated below, HMG's motion to strike [ECF 106] and TP's motion to strike [ECF 103] are treated as objections, and the parties' objections [ECF 103; ECF 106; ECF 116] are **DENIED**. The parties' summary judgment motions [ECF 83; ECF 104] are each **GRANTED IN PART AND DENIED IN PART**.

# I.    Background

## A.    Statement of Facts

The following facts are agreed or supported by undisputed record evidence unless otherwise noted. This is a breach of contract action arising from an agreement between HMG and TP, giving TP the exclusive license to manufacture a working replica (the Firearm) of the StG44, a World War II-era firearm. Everett "Mac" Steil, one of HMG's two co-founders, developed the plans for the Firearm.[1] As such, HMG owns the intellectual property related to the Firearm.[2] Realizing it did not have the capacity to manufacture the Firearm to meet projected demand, HMG sought out a reputable manufacturer and, in mid-2018, was introduced to TP through mutual industry contacts.[3]

Over the course of approximately six months, the parties met in Atlanta and Utah to hammer out details regarding production and sale of the Firearm.[4] While they disagree about certain representations supposedly made during their negotiations, it is undisputed that they discussed "TP manufacturing parts and

---

[1]    ECF 92, at 2.

[2]    *Id.*

[3]    *Id.* at 2–3.

[4]    *Id.* at 3.

assembling [the Firearm] and components related thereto."[5] TP admits that HMG

"shared written plans and specifications" related to the Firearm before the parties

came to any agreement.[6] After some back-and-forth, including visits to TP's

facility in Utah and HMG's facility in Georgia, other meetings between the parties,

and TP's manufacturing and shipping of "first articles" relating to the Firearm's

components for HMG's inspection, the parties entered into an "Exclusive License

Agreement" (the Agreement) on January 22, 2019.[7]

      HMG asserts that the Agreement granted TP an "exclusive, royalty-bearing

license to manufacture the Firearm."[8] The Agreement provided that TP would

"have the sole responsibility and obligation for the cost of manufacturing, labeling,

storing, packaging, and distributing" the Firearm.[9] TP "admits only that the

parties signed the Agreement, but denies that . . . HMG's payment obligation in

the Agreement reflects the intent of the parties."[10] TP maintains that, contrary to

---

[5]  *Id.*

[6]  *Id.* at 4.

[7]  *Id.* at 6.

[8]  ECF 92, at 7.

[9]  ECF 1-1, at 4. The Agreement is reproduced several times over in the parties' filings. For ease of reference, the Court cites the copy attached to HMG's Complaint.

[10]  ECF 92, at 7.

the plain text of the Agreement, the arrangement "between TP and HMG has at all times been that HMG would pay TP for its costs to manufacture parts and assemble [the Firearm], before calculating the royalty that was to be split by the parties." TP's manufacturing costs, among other expenses, are at the center of this dispute.

The Agreement further provided for the transfer from HMG to TP of the "Licensed Know-How and other technical expertise necessary for the manufacture" of the Firearm (the Technology).[11] The parties dispute whether and to what extent transfer of the Technology occurred, and whether the transferred Technology was adequate to manufacture the Firearm. Over the course of the Agreement's term, the parties made as many as 86 revisions to the Firearm's design.[12] Who initiated those improvements and whether they were made to ease the manufacturing process or fix flaws in the Firearm's initial design to compensate for the Technology are disputed.[13]

At some point, TP was able to assemble at least two Firearms, which it maintains were unsafe and susceptible to jamming if manufactured according to

---

[11]   ECF 1-1, at 5.

[12]   *Id.* at 16.

[13]   *Id.*

HMG's plans and specifications.[14] For its part, HMG claims that it assembled Firearms manufactured by TP that were capable of firing using the magazine parts provided by TP.[15]

TP eventually became concerned with the expense of its continued performance under the Agreement. On January 14, 2020, TP sent HMG an email, which purportedly addressed "various issues not covered by the Agreement, as well as the Agreement's failure to reflect the true agreement of the parties," such as "the cost of manufacture [and] unforeseen research and development costs incurred by TP," among other items.[16] Indeed, Christopher Woods, TP's president, has since explained that TP "felt [it] needed some major changes to [the Agreement] because it wasn't in [TP's] benefit."[17] The parties' relationship continued to deteriorate thereafter.

On February 10, 2020, HMG responded to TP, invoking the Agreement's dispute resolution provision, and demanding 500 Firearms by March 5.[18] On February 26, counsel for TP sent a letter to HMG purporting to notify it that HMG

---

[14]   *Id.* at 17; ECF 92, at 2.

[15]   ECF 1-1, at 18.

[16]   *Id.* at 21.

[17]   *Id.*

[18]   ECF 96-12, at 1.

had defaulted on its obligations under the Agreement, and that it had 60 days to cure by providing plans by which the Firearm could be manufactured.[19] TP's letter further indicated that it would retain certain "parts" belonging to HGM until HGM paid $994,863.20, which represents TP's estimated "research and development expense" and its costs "in connection with purchasing, production of parts, and equipment for the [F]irearm," *i.e.*, the sum of "every expense that [TP] incurred in connection with moving forward with [the Agreement]."[20]

Eventually, the parties agreed to mediate their dispute. On May 4, 2020, the day before the mediation began, TP's counsel sent HMG's counsel an email that contained a link to a video TP created and posted publicly on Vimeo, a video hosting and sharing platform.[21] TP created the video to demonstrate its difficulties with manufacturing the Firearm, which necessarily required discussion of the Firearm's features, components, and design.[22] The parties' mediation efforts resulted in an impasse. On May 26, 2020, HMG sent TP a "Notice of Termination"

---

[19]   *Id.* at 3–7.

[20]   *Id.* at 5; ECF 83-8, at 47.

[21]   ECF 11, ¶¶ 31–32; ECF 104-1, at 11–12.

[22]   ECF 104-1, at 12.

pursuant to the Agreement.[23] On July 7, TP issued a demand letter, in which it requested that HMG retrieve its property from TP.[24] This litigation followed.

### B.   Procedural History

HMG initiated the action on June 8, 2020.[25] The Complaint contains ten counts: (1) breach of contract related to the Firearm's manufacture; (2) breach of the Agreement's confidentiality provision; (3) promissory estoppel; (4) "quantum meruit/valebant and/or unjust enrichment"; (5) tortious interference with contract; (6) negligent misrepresentation; (7) conversion; (8) injunctive relief; (9) punitive damages; and (10) attorney's fees and costs. On July 7, TP filed its Answer and asserted six counterclaims: (1) breach of contract; (2) unjust enrichment; (3) fraud; (4) negligent misrepresentation; (5) punitive damages; and (6) attorneys' fees.[26]

On July 20, 2020, HMG moved for a preliminary injunction compelling TP to turn over heavy equipment, raw materials, parts, tools, and custom dies related to the Firearm.[27] The Court conducted an evidentiary hearing on the motion, and,

---

[23]   ECF 96-12, at 7.

[24]   ECF 17-3, at 70.

[25]   *See generally* ECF 1.

[26]   *See generally* ECF 11.

[27]   ECF 17-1, at 12.

on September 18, entered an Order compelling TP to make available to HMG all machines, tooling, extrusions, and parts listed in Exhibit 1 to the injunction motion.[28] HMG was ordered to post a $25,000 security bond.[29]

On April 16, 2021, after extending discovery several times, the Court denied TP's motion for leave to amend its counterclaims.[30] On June 22, HMG filed its summary judgment motion on its breach of contract claim and TP's counterclaims.[31] TP moved to extend discovery pending the Court's disposition of HMG's summary judgment motion,[32] which the Court denied on August 16.[33] On August 17, TP responded to HMG's summary judgment motion and filed its response to HMG's Statement of Undisputed Material Facts,[34] as well as its Statement of Additional Material Facts as to Which Genuine Issues Remain to Be Tried.[35] On August 31, HMG filed a reply to TP's response,[36] and a purported

---

[28]   ECF 40; ECF 45.

[29]   ECF 45.

[30]   ECF 79; ECF 80.

[31]   ECF 83.

[32]   ECF 90.

[33]   D.E. 8/16/21.

[34]   ECF 92 (Resp. to SUMF); ECF 94 (Resp. to SJM).

[35]   ECF 93.

[36]   ECF 101.

"Reply in Support of its Statement of Undisputed Material Facts."[37] TP moved to strike the latter filing on September 2.[38] The motion to strike and HMG's summary judgment motion are before the Court.

On September 15, 2021, TP cross-moved for summary judgment.[39] On October 6, HMG moved to strike portions of the Declaration of Christopher Woods (the Woods Declaration).[40] TP objected to certain statements in the Declarations of Everett "Mac" Steil and Hill Redwine on October 20.[41] These motions and objections are also before the Court.

## II.    Non-Dispositive Motions

HMG moves pursuant to Federal Rule of Civil Procedure 12(f) to strike statements from the Woods Declaration. While HMG styles its motion to strike as one targeting inadmissible hearsay, it actually objects to certain declarants' supposed speculation.[42] TP likewise objects to certain statements in the Steil

---

[37]   ECF 102.

[38]   ECF 103.

[39]   ECF 104.

[40]   ECF 106.

[41]   ECF 116.

[42]   ECF 106. It appears that HMG conflates hearsay in violation of Fed. R. Evid. 801 with the requirement that a lay witness may generally only testify to a matter if he or she has personal knowledge of it pursuant to Fed. R. Evid. 602.

Declaration on essentially the same grounds.[43] The parties each argue that their propounded declarations should be considered because they set forth facts within the offering individual's knowledge. Also, TP moves pursuant to Rule 12(f) to strike HMG's Reply in Support of Its Statement of Undisputed Material Facts, which it argues is an improper supplemental brief in violation of NDGa, LR 56.1(A) and 7.1(C).[44] In response, HMG contends that it filed its second reply out of "an abundance of caution" in response to additional alleged material facts TP presented in two separate filings.[45]

The parties' motions are denied. Motions to strike are "time wasters," disfavored by this Court and others, and viewed as "a drastic remedy to be resorted to only when required for the purposes of justice." *TracFone Wireless, Inc. v. Zip Wireless Prod., Inc.*, 716 F. Supp. 2d 1275, 1290 (N.D. Ga. 2010) (citing *Stephens v. Trust for Pub. Land*, 479 F. Supp. 2d 1341, 1346 (N.D. Ga. 2007)). The Court finds that justice does not require the drastic remedy the parties seek.

---

[43]   ECF 116. TP complains that certain statements are speculative and beyond the declarant's personal knowledge.

[44]   ECF 103.

[45]   ECF 105, at 2.

First, the motions to strike are procedurally improper for the relief sought here. Rule 12(f) permits the Court to "strike from *a pleading* an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f) (emphasis added). Since Rule 12(f) only contemplates striking material from a pleading, this Court routinely finds that a motion to strike "is not the appropriate vehicle for challenging the consideration of evidence." *Green v. ADCO Int'l Plastics Corp.*, No. 1:17-cv-337-WSD-LTW, 2017 WL 8810690, at *5 (Dec. 27, 2017), *report and recommendation adopted*, 2018 WL 739794 (N.D. Ga. Feb. 7, 2018); *see also S. River Watershed All., Inc. v. DeKalb Cnty., Ga.*, 484 F. Supp. 3d 1353, 1362 (N.D. Ga. 2020) (quoting *Nelson v. Jackson*, No. 1:14-cv-02851-ELR-JFK, 2016 WL 9454420, at *1 (May 18, 2016), *report and recommendation adopted as modified*, 2016 WL 9455425 (N.D. Ga. June 30, 2016) ("[M]otions, briefs or memoranda, objections, or affidavits may not be attacked by the motion to strike.")).

Second, a district court may consider evidence at summary judgment if it is capable of being reduced to admissible form at trial. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293–94 (11th Cir. 2012) (applying this proposition to hearsay statements). The parties' hearsay and/or personal knowledge objections here are unfounded, as the challenged evidence may be reduced to admissible form at trial. *Cf. Hijeck v. Menlo Logistics, Inc.*, 3:07-cv-0530-G, 2008 WL 465274, at

*4 (N.D. Tex. Feb. 21, 2008) (citing *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 433 (5th Cir.2006)) ("It is not necessary that [the corporate representative] have direct, personal knowledge of each and every fact discussed in her affidavit or deposition. . . . [T]he corporation appears vicariously through that agent. The authority of a corporate representative extends not only to facts, but also to the subjective beliefs and opinions of the corporation."); *Nawab v. Unifund CCR Partners*, 2013 WL 6823109, at *2–3 (11th Cir. Dec. 27, 2013) (concluding that the affidavit of a manager of legal operations, describing the plaintiff's account history, comported with Rule 56(c) because the affiant "relied on her personal knowledge of [the company's] accounts and her personal review of company records that [the company] maintained in the ordinary course of business.").

Accordingly, the Court denies the parties' non-dispositive motions.[46] Nevertheless, HMG's Reply in Support of Its Statement of Undisputed Material Facts is largely redundant of its Reply to TP's Statement of Additional Material Facts.[47] Because the reply was filed without leave of Court, it will be disregarded for purposes of ruling on the parties' substantive motions.

---

[46]   ECF 103; ECF 106; ECF 116.

[47]   *Compare* ECF 101 *with* ECF 102.

### III.   Summary Judgment

#### A.   Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it can affect the outcome of the lawsuit under the governing legal principles. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party seeking summary judgment has the burden of informing the district court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If a movant meets its burden, the party opposing summary judgment must present evidence showing either (1) a genuine issue of material fact or (2) that the movant is not entitled to judgment as a matter of law. *Id.* at 324.

In determining whether a genuine issue of material fact exists, the evidence is viewed in the light most favorable to the party opposing summary judgment, "and all justifiable inferences are to be drawn" in favor of that party. *Anderson*, 477 U.S. at 255; *see also Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir. 1999). "Credibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions," and cannot be made by the court in evaluating summary judgment. *Anderson*, 477 U.S. at 255. *See also Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). Summary judgment for the moving party is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### B. Threshold Determinations on Claims and Defenses

#### 1. The Parties Fail to Plead Unjust Enrichment in the Alternative to Breach of Contract.

HMG and TP assert dueling unjust enrichment claims that fail as a matter of law. Unjust enrichment is "an equitable principle that may be applied when there is no valid written contract between the parties." *Collins v. Athens Orthopedic Clinic*, 356 Ga. App. 776, 778 (2020) (citation omitted). "While a party . . . cannot *recover* under both a breach of contract and unjust enrichment theory, a plaintiff may plead these claims in the alternative." *Clark v. Aaron's, Inc.*, 914 F. Supp. 2d 1301, 1309 (N.D. Ga. 2012) (emphasis in original). However, HMG and TP failed in this regard.

The parties impermissibly incorporate their breach of contract claims into their unjust enrichment claims. Courts across the country have held that plaintiffs did not plead in the alternative where, as here, they expressly incorporated by

reference inconsistent allegations from one cause of action into another. *E.g., Fort Prods., Inc. v. Men's Med. Clinic, LLC*, No. 15-CV-00376 (NSR), 2016 WL 797577, at *4 (S.D.N.Y. Feb. 23, 2016) (dismissing claim where, "[o]n the face of the Amended Complaint, [the] [p]laintiff's account stated claim [was] not pled in the alternative to the breach of contract claim"); *Gibbons v. McBride*, No. CV 114-056, 2014 WL 5460593, at *3 (S.D. Ga. Oct. 27, 2014) (noting a "complaint justifiably may be dismissed" where, among other things, each count "fully incorporates every paragraph that has proceeded it"); *Rivers v. Skate Warehouse, LLC*, No. CV 12-09946 MMM (CWx), 2013 WL 12128800, at *12 n.66 (C.D. Cal. Apr. 15, 2013) (recognizing that federal procedural rules allow pleading in the alternative, but dismissing the plaintiff's breach of contract claim because he inconsistently incorporated a lack of consent argument into his breach of contract claim, which constituted a binding and fatal judicial admission as to that claim); *see also Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1321–23 (11th Cir. 2015) (identifying one form of impermissible shotgun pleading as "a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint").

HMG incorporates by reference "each foregoing paragraph" of its Complaint in its claim for unjust enrichment "as if set forth herein verbatim."[48] Likewise, TP's unjust enrichment counterclaim "restates and incorporates . . . by reference the allegations contained" in all preceding paragraphs of its Answer and Counterclaims, including those that pertain to its breach of contract counterclaim.[49] Therefore, both parties have failed to plead breach of contract and unjust enrichment in the alternative, and their unjust enrichment claims fail on this ground.

Consequently, HMG and TP's summary judgment motions are granted to the extent that each party seeks summary judgment on the other's unjust enrichment claim.

### 2.    The Parties Affirmed the Agreement.

The Agreement contains a merger clause,[50] but the parties disagree as to whether that clause prohibits the use of parol evidence about allegedly fraudulent representations made prior to execution of the Agreement.[51] The Court finds that

---

[48]   ECF 1, ¶ 53.

[49]   ECF 11, ¶ 37.

[50]   ECF 1-1, ¶ 10.4.

[51]   ECF 94, at 14.

HMG and TP affirmed the Agreement through their dealings subsequent to any alleged fraudulent conduct on the other party's behalf, ratifying the Agreement's merger clause and precluding their fraud claims as a matter of law.

"In general, a party alleging fraudulent inducement to enter a contract has two options: (1) affirm the contract and sue for damages from the fraud or breach; or (2) promptly rescind the contract and sue in tort for fraud." *Weinstock v. Novare Grp., Inc.*, 309 Ga. App. 351, 354 (2011) (citing *Ekeledo v. Amporful*, 281 Ga. 817, 819 (2007)). "An announcement of the intent to rescind the contract must be made in a timely fashion, as soon as the facts supporting the claim for rescission are discovered." *Holloman v. D.R. Horton*, 241 Ga. App. 141, 146–47 (1999) ("The original complaint, by affirming the contract and seeking damages resulting from the alleged fraud without alleging any cause of action for rescission, constituted an election of remedies and a waiver of any rescission claim.").

Georgia courts have "generally found that a claim for damages unaccompanied by a claim for recission operates as an election to affirm the underlying contract." *Weinstock*, 309 Ga. App. 354. Both HMG and TP seek damages for breach of contract; neither asserts a claim for rescission. *Cf. Liberty v. Storage Trust Properties, L.P.*, 267 Ga. App. 905, 911 (2004) (citation omitted) ("By seeking damages for breach of contract in his complaint, Liberty took action

'inconsistent with a repudiation of the transaction' and lost his right to rescind the contract.").

TP insists that it did not affirm the Agreement, but rather it terminated the Agreement prior to filing suit, and a termination is equivalent to a recission such that its fraud claims should survive summary judgment.[52] In support, TP cites *Radio Perry, Inc. v. Cox Commc'ns, Inc.*, 323 Ga. App. 604, 611 (2013). But here, on summary judgment, TP has failed to establish a dispute of material fact as to whether it unilaterally rescinded the Agreement. On the contrary, TP's February 26, 2020 letter to HMG was neither a termination nor a unilateral recission of the Agreement. By its own terms, TP's letter was "formal notice under [the Agreement] that HMG has defaulted . . . and that HMG has 60 days to cure" in response to HMG's proposed Termination of Exclusive License Agreement.[53] In any case, *Radio Perry* does not address or alter *Weinstock*'s controlling propositions of law concerning fraudulent inducement claims, which TP's authorities echo.[54]

Further, "[i]t is incumbent upon a party who attempts to rescind a contract for fraud" to do so "promptly on discovery of the fraud," otherwise such a party

---

[52]   ECF 94, at 17.

[53]   ECF 94-5, at 19.

[54]   ECF 94, at 18.

will be "conclusively bound by the contract as if no fraud or mistake had occurred." *Flair Fashions, Inc. v. SW CR Eisenhower Drive, Inc.*, 207 Ga. App. 78, 79 (1993). Both parties failed on multiple occasions to rescind (let alone repudiate) the Agreement, even when each party believed the other had misrepresented its capabilities. For example, if (as HMG alleges) it "made more than 86 revisions to the plans for the Firearm, the vast majority of which were made at the behest of [TP]," then it knew long before the Agreement terminated that TP could not manufacture the Firearm per HMG's design as allegedly represented, and it could have rescinded the Agreement and sued in fraud.[55] Likewise, if TP knew that HMG's design was unworkable, but it nevertheless "attempted in good faith [over the course of several months] to fulfill its obligations under the [Agreement] by . . . working to correct various problems in HMG's design, plan, and specifications," then TP affirmed the contract through its continued performance.[56] At the evidentiary hearing the Court conducted on September 18, 2020, TP conceded that HMG had "bad prints, which we thought all the time."[57]

---

[55]   ECF 83-1, at 9.

[56]   ECF 11, ¶ 32.

[57]   ECF 83-8, at 47.

Instead, HMG and TP affirmed the contract through their continued performance. This is underscored by the fact that neither HMG nor TP suggests that it learned of any alleged fraudulent misrepresentation *only after* filing its pleadings and taking discovery. *Cf. Weinstock*, 309 Ga. App. at 354. Nor did either party assert a recission claim along with its fraud claims. *See Nexus Svcs., Inc. v. Manning Tronics, Inc.*, 201 Ga. App. 255, 256 (1991) (noting, under similar circumstances, that rescission was a prerequisite to the filing of the action).

HMG challenges TP's fraud-based counterclaims under the Agreement's merger clause. But, because HMG *and* TP affirmed the Agreement, "[t]he presence of a merger clause in the underlying contract is determinative" for each party. *Id.* at 255. Likewise, neither party can maintain a "defense of fraud . . . the functional equivalent of a tort action for fraud and deceit." *Flair Fashions*, 207 Ga. App. 78 (citation omitted). "Simply put, what is good for the goose is good for the gander." *United States v. Arroyo-Jaimes*, 608 F. App'x 843, 849 (11th Cir. 2015).

HMG's summary judgment motion is granted as to TP's fraud and negligent misrepresentation counterclaims, fraud and mistake defenses, and underlying dependent counterclaim for punitive damages. *Shuler v. Bank of Am.*, N.A., No. 4:12-CV-0313-HLM, 2016 WL 5339352, at *16 (N.D. Ga. Jan. 27, 2016) (citations omitted) ("First, a punitive damages claim is derivative . . . . Second, Plaintiff

cannot prevail on an underlying tort claim, and O.C.G.A. § 51-12-5.1 allows for an award of punitive damages 'only if the plaintiff prevails on an underlying tort claim.'"). TP's motion for summary judgment is granted as to HMG's negligent misrepresentation claim and fraud defense. TP's motion for summary judgment is also granted as to HMG's promissory estoppel claim for the reasons discussed above. *W.R. Grace & Company–Conn. v. Taco Tico Acquisition Corp.*, 216 Ga. App. 423, 426 (1995) (citation omitted) ("This court has consistently held that disclaimers in contracts prevent justifiable reliance on other representations purportedly made by the parties; we perceive no difference between reasonable reliance in promissory estoppel cases and justifiable reliance in other cases sufficient to warrant a different result."). *See Mims v. Cagle Foods JV, LLC*, 148 F. App'x 762, 769 (11th Cir. 2005) (affirming the district court's grant of summary judgment on the plaintiff's promissory estoppel and fraud claims owing to the disputed contract's merger clause).

### C.    Breach of Contract Claims

This case appears to present a "battle of the breaches"—the parties present conflicting declarations and evidence to cast each other as the one who violated the Agreement—suggesting this case is a poor candidate for disposition at summary judgment.

In Georgia, "[t]he essential elements of a breach of contract claim are (1) a valid contract; (2) material breach of its terms; and (3) damages arising therefrom." *Brooks v. Branch Banking & Tr. Co.*, 107 F. Supp. 3d 1290, 1295 (N.D. Ga. 2015) (citation omitted). Georgia law is clear that "construction [of a contract] is a matter of law for the court."[58] *Envision Printing, LLC v. Evans*, 336 Ga. App. 635, 638 (2016) (quoting *Gen. Steel v. Delta Bldg. Sys.*, 297 Ga. App. 136, 138 (2009)). *See also Gans v. Ga. Fed. Sav. & Loan Ass'n*, 179 Ga. App. 660, 662 (1986) ("It is ordinarily the duty of the court to interpret a contract as a matter of law").

Construction of a contract requires three steps:

> First, the trial court must decide whether the language is clear and unambiguous. If it is, no construction is required, and the court simply enforces the contract according to its clear terms. Next, if the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity. Finally, if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury.

---

[58] The parties are silent where choice of law is concerned, and the Agreement contains a choice of law clause that provides it "shall be governed and construed in accordance with the laws of the State of Georgia, without regard to choice of law principles" [ECF 1-1, ¶ 10.6]. In light of that fact and the parties' citation to Georgia case law, the Court applies Georgia law to this dispute.

*Id.* (quoting *Gen. Steel*, 297 Ga. App. at 138).

As for the first step, "[t]he court first looks to the four corners of the agreement to ascertain the meaning of the contract from the language employed." *Brogdon v. Pro Futures Bridge Cap. Fund*, L.P., 260 Ga. App. 521, 523 (2003). *See* O.C.G.A. § 13-2-2(2) ("Words generally bear their usual and common signification; but technical words, words of art, or words used in a particular trade or business will be construed generally, to be used in reference to this peculiar meaning."); *see also King v. GenOn Energy Holdings, Inc.*, 323 Ga. App. 451, 455 (2013) ("[T]he usual and common meaning of a word may be supplied by common dictionaries."). "[W]here the language of [the] contract is clear, unambiguous, and capable of only one reasonable interpretation, no construction is necessary or even permissible by the trial court." *Ainsworth v. Perreault*, 254 Ga. App. 470, 476 (2002).

An "[a]mbiguity exists where the words used in the contract leave the intent of the parties in question—*i.e.*, that the intent is uncertain, unclear, or is open to various interpretations." *Gen. Steel*, 297 Ga. App. at 138. *See ESI Cos., Inc. v. Fulton Cnty.*, 271 Ga. App. 181, 184 (2004) ("Ambiguity in a contract may be defined as duplicity, indistinctness, and uncertainty of meaning or expression."). "But neither an erroneous interpretation of contract language nor a later decision to revise that

language creates ambiguity in contract language that is capable of only one reasonable interpretation." *Mullis v. Bibb Cnty.*, 294 Ga. App. 721, 723 (2008).

If an ambiguity exists, the Court applies the rules of construction to resolve it. *Envision Printing*, 336 Ga. App. at 638. And "[t]he cardinal rule of construction is to ascertain the intention of the parties." O.C.G.A. § 13-2-3. "Courts also analyze the contract as [a] whole (not merely isolated clauses and provisions) and interpret it both to give the greatest effect possible to all provisions and to avoid rendering any of the provisions meaningless. The underlying principle is that the contract must be read reasonably and in a way that does not lead to an absurd result." *Gilreath Fam. & Cosm. Dentistry, Inc. v. Cincinnati Ins. Co.*, 522 F. Supp. 3d 1279, 1285 (N.D. Ga. 2021) (cleaned up) (citations omitted), *aff'd*, No. 21-11046, 2021 WL 3870697 (11th Cir. Aug. 31, 2021).

### 1.    TP's Breach of Contract Claim

HMG moves for summary judgment on TP's breach of contract counterclaim, arguing that (1) TP fails to identify a breach of any duty contemplated in the Agreement,[59] and (2) there is no genuine issue of material fact as to whether HMG provided "reasonable assistance" to TP per the Agreement.[60]

---

[59]   ECF 83-1, at 13–16.

[60]   *Id.* at 16–18.

TP counters that HMG had a duty under the Agreement to provide TP with the "Licensed Know-How" and "other technical expertise necessary for the manufacture of the Licensed Products," *i.e.*, the Technology, and there is a dispute of material fact as to whether HMG satisfied this duty.[61] Further, TP moves for summary judgment on this claim, insisting that it is entitled to recover the value of the rifle parts the Court ordered it to deliver to HMG.[62]

HMG's duty to transfer the Technology to TP emanates from Paragraph 4.9 of the Agreement. Regarding the duty, the Agreement states, in pertinent part:

> **Technology Transfer.** HMG shall provide reasonable assistance to transfer to [TP] the Licensed Know-How and other technical expertise necessary for the manufacture of Licensed Products. During the first six (6) months after the Effective Date, HMG will provide reasonable advice and training to [TP], including making qualified personnel of HMG available, at no additional cost to [TP] (other than reimbursement of reasonable travel-related expenses) in order to assist [TP] in its understanding and use of the Licensed Know-How. [TP] will request assistance in such a way as to minimize the disruption to the operations of HMG and the day-to-day responsibilities of HMG personnel. . . .[63]

Paragraph 1.2 defines "Licensed Know-How":

---

[61]  ECF 94, at 13–17.

[62]  ECF 104-1, at 23–25.

[63]  *Id.*

> **Licensed Know-How** means any unpublished information and materials, whether or not proprietary and/or patentable, including but not limited to concepts, data, databases, designs, discoveries, documents, drawings, formulas, ideas, inventions, methods, plans, practices, procedures, specifications, technology, tools, trade secrets, and works of authorship related to the Licensed Products, to the extent owned or controlled by HMG.[64]

TP first avers that HMG breached its duty to "provide accurate and precise manufacturing plans and specifications for a safe, functional [F]irearm that could be assembled with unskilled labor."[65] In HMG's view, TP reads duties into the Agreement that do not exist.[66] Looking only to the four corners of the Agreement to determine the meaning of the language the parties employed, as this Court must, the Court finds no specific duty under the Agreement "to provide accurate and precise manufacturing plans and specifications" for a Firearm that "could be assembled with unskilled labor," as TP claims.[67] While the Firearm's functionality is implied by common sense and the Agreement's citation to HMG's patents, the Agreement is entirely devoid of reference to the skill level required to successfully

---

[64]   *Id.* ¶ 1.2.

[65]   ECF 11, ¶ 34.

[66]   ECF 83-1, at 13–15.

[67]   ECF 11, ¶ 34.

manufacture the Firearm.[68] But Paragraph 4.9 of the Agreement did unequivocally obligate HMG to "provide *reasonable assistance to transfer*" the Technology—the Licensed Know-How *and* "other technical expertise[—] necessary" to manufacture the Firearm.[69]

HGM maintains that the rest of Paragraph 4.9 identifies to what "reasonable assistance" refers: "[T]he term 'reasonable assistance' should be read to mean, within the first six months of the Agreement, providing 'reasonable advice and training' to TP . . . to assist TP in its understanding and use of the Licensed Know-How."[70] However, an examination of Paragraph 4.9 of the Agreement shows that "reasonable assistance" unambiguously refers to HMG's obligation to transfer the Technology, not its separate obligation to "provide reasonable advice and training" on the implementation of the transferred Technology during the first six months after the Agreement's effective date. Thus, HMG was obligated to (1) reasonably assist TP in the transfer of the Technology needed to manufacture the Firearm, and (2) train TP on the use of the Technology for a short time if, and only if, TP requested training. Of these items, the parties primarily dispute whether

---

68   ECF 1-1, at 12.

69   *Id.*, ¶ 4.9 (emphasis added).

70   ECF 83-1, at 16.

HMG satisfied its first obligation to "reasonably assist" TP in the transfer of the *necessary* Technology.

What constitutes "reasonable assistance" is ambiguous and unclear. Its definition is indistinct—neither ascertainable from the remainder of Paragraph 4.9 nor discernable from the Agreement as a whole. *ESI Cos., Inc.*, 271 Ga. App. at 184. Relative to this duty, HMG asserts that there is no genuine question of material fact that it provided "reasonable assistance" as contemplated in the Agreement.[71] It is undisputed that HMG provided TP with at least some Technology, *i.e.*, plans, specifications, and tools to manufacture the Firearm, and that TP had the opportunity to review HMG's then-existing Technology before executing the Agreement.[72] It is likewise undisputed that HMG provided some Technology and technical advice and training to TP regarding how to manufacture the Firearm—both before and after the parties executed the Agreement.[73] However, while the parties agree that "HMG made efforts to transfer" Technology to TP, whether those efforts were reasonable and whether HMG conveyed the Technology

---

[71]   ECF 83-1, at 16–18.

[72]   ECF 114, at 7–8.

[73]   ECF 11, ¶ 54.

*necessary* for the manufacture of the Firearm to TP are open questions that the parties attempt to answer with conflicting material facts.[74]

"[W]hat the ambiguous language means and what the parties intended must be resolved by a jury." *Envision Printing*, 336 Ga. App. at 638 (quoting *Gen. Steel*, 297 Ga. App. at 138). As a result, the Court denies HMG's and TP's summary judgment motions as they relate to TP's breach of contract counterclaim. Along with it, TP's counterclaim for attorney's fees survives to the extent it depends on, and is not independent of, TP's breach of contract claim. *See D.G. Jenkins Homes, Inc. v. Wood*, 261 Ga. App. 322, 325 (2003) ("The derivative claims of attorney's fees and punitive damages will not lie in the absence of a finding of compensatory damages on an underlying claim."); *see also Kammerer Real Estate Holdings, LLC v. Forsyth Cnty. Bd. of Comm'rs*, 302 Ga. 284, 287 (2017) (noting that "a claim for attorney fees under OCGA § 13-6-11 is a derivative claim").

Regarding damages, the Agreement unambiguously mandated that TP "shall have the sole responsibility and obligation for the costs of the manufacturing" of the Firearm.[75] Consequently, HMG's summary judgment motion is granted as to TP's "costs to purchase parts, costs to manufacture parts,

---

74   ECF 92, at 12–14.

75   ECF 1-1, ¶ 4.4.

[and] costs spent trying to assemble the [F]irearm."[76] These costs were TP's to shoulder per the Agreement's plain terms.[77] The latter category of "costs spent trying to assemble the Firearm" and those related to "research and development" TP conducted to adapt HMG's allegedly defective Technology are costs TP bore voluntarily, as the Agreement did not create a duty to adapt HMG's technology and TP acknowledged that HMG was "solely responsible for ensuring the parts were correctly designed."[78] TP may only attempt to recover damages for "lost profits" and nominal damages as a result of HMG's alleged breach of contract.[79] *See Bldg. Materials Wholesale, Inc. v. Triad Drywall, LLC*, 287 Ga. App. 772, 775 (2007) (citation omitted) ("[I]t is incumbent on the plaintiff to show what revenues he would have obtained from the transaction, as well as the expenses he would have incurred in generating those revenues. The plaintiff must prove both anticipated revenues and expenses with reasonable certainty in order to recover.").

---

[76]   ECF 11, ¶ 36.

[77]   ECF 1-1, ¶ 4.4.

[78]   ECF 94, at 15.

[79]   ECF 11, ¶ 36.

### 2.     HMG's Contract Claims

HMG asserts TP breached the Agreement: (1) by failing to manufacture Firearms as specified in the Agreement, and (2) violating the Agreement's confidentiality provision.[80] HMG and TP cross-move for summary judgment as to HMG's breach of contract claim related to the manufacture of the Firearm.[81] TP also moves for summary judgment on HMG's claim for breach of the Agreement's confidentiality provision.[82] The Court addresses these claims, in turn.

### i.     Breach of the Duty to Manufacture

### a.     HMG's Claim

HMG argues that there is no genuine issue of material fact that "TP breached its obligations to manufacture" 500 Firearms.[83] HMG further argues that TP's contract defenses do not preclude the entry of summary judgment on its breach of contract claim because the defenses are inoperative or inapplicable.[84] TP maintains that HMG is unable to carry its burden on summary judgment and surmount TP's

---

[80]   ECF 1, at 13–15.

[81]   ECF 83-1, at 23–25; ECF 104-1, at 2–11.

[82]   ECF 104-1, at 12–13.

[83]   ECF 83-1, at 24–25; ECF 94, at 18.

[84]   ECF 83-1, at 24–25.

contract defenses.[85] TP also argues that it is entitled to summary judgment on HMG's breach of contract claim because the Agreement is wholly unenforceable for want of mutuality, HMG incurred no damages, and TP was excused from performance due to impossibility.

The Agreement provides TP an exclusive royalty-bearing license in exchange for its collaboration with HMG in the design and manufacture of the Firearm to the exclusion of other manufacturers:

> HMG hereby grants to [TP], and [TP] hereby accepts, an exclusive royalty-bearing license under the Licensed Patents and Licensed Know-How to manufacture the Licensed Products in the Territory in accordance with the terms of this Agreement and to sell the Licensed Products to HMG only.
>
> . . . .
>
> During the term of this Agreement, the Parties will not, directly or indirectly, enter into a collaboration, agreement, or license with any Third Party in connection with the design, development, manufacture, or commercialization of a modernized [Firearm] in the Territory.[86]

The Agreement further provides:

> During the term of this Agreement, HMG shall use reasonable efforts to market, commercialize and obtain

---

[85]   ECF 94, at 21.

[86]   ECF 1-1, ¶¶ 3.1, 3.3.

purchase orders for Licensed Products in the Territory[;] HMG shall provide [TP] with reasonable notice of required inventory projected for commercial sale and distribution of Licensed Products; and [TP] shall schedule production and order materials to meet such projections[;] and [TP] will use reasonable efforts to manufacture and deliver Licensed Products that meet the Specifications in accordance with the quantities and delivery dates specified by HMG. To the extent possible, TP will promptly notify HMG in writing of any delay at least ten (10) days before HMG's originally specified delivery date.[87]

These terms are unambiguous, so construction is neither necessary nor permissible. *Ainsworth*, 254 Ga. App. at 476. From the Agreement's plain language in Paragraphs 3.1 and 3.3, the parties agreed that TP would have an exclusive royalty-bearing license to manufacture the Firearm. However, the parties disagree as to the enforceability—not the import—of the latter provisions, Paragraphs 4.1–4.3. TP argues that "the Agreement contains no obligation by HMG to purchase or order any firearms at all . . . which prevents the Agreement from being an enforceable requirements contract."[88] HMG counters that the Agreement is an

---

[87]   *Id.* ¶¶ 4.3–4.5.

[88]   ECF 104-1, at 3.

exclusive dealings contract, which, "like a requirements contract, contains commonly used open quantity terms."[89] HMG is correct.

Requirements agreements and output agreements "measure[ ] the quantity by the output of the seller or the requirements of the buyer . . . as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate . . . or otherwise comparable prior output or requirements may be tendered or demanded." O.C.G.A. § 11-2-306(1). An exclusive dealings contract, however, "imposes[,] unless otherwise agreed[,] an obligation by the seller to use best efforts to supply the goods[,] and by the buyer to use the best efforts to promote their sale." *Id.* § 11-2-306(2). Exclusive dealings contracts, while uncommon, are enforceable if they are strictly limited in time and territorial effect. *PCS Joint Venture, Ltd. v. Davis*, 219 Ga. App. 519, 520 (1995) (quoting *Jenkins v. Jenkins Irrigation*, 244 Ga. 95, 98 (1979)). In the absence of an obligation to purchase all requirements, "there is no requirements contract and the promise of the seller becomes merely an invitation for orders and a contract is not consummated until an order for a specific amount is made by the buyer." *Integrated Micro Sys., Inc. v.*

---

[89]   ECF 107, at 3 (citing *O.N. Jonas Co. v. Badische Corp.*, 706 F.2d 1161, 1165 (11th Cir. 1983) ("The agreement between Badische and Jonas was analogous to an exclusive dealership agreement, one of the most common situations where indefinite quantity term contracts are used.")).

*NEC Home Elecs. (USA), Inc.*, 174 Ga. App. 197, 198 (1985) (cleaned up) (citation omitted).

The Agreement contains term and territory restrictions, so it is not unenforceable on those grounds.[90] *PCS Joint Venture*, 219 Ga. App. at 520. It is also based on valuable consideration—TP's obligation to use reasonable efforts to manufacture the Firearm and HMG's obligation to use reasonable efforts to sell the Firearm, as well as an exclusive license for TP to use HMG's intellectual property in exchange for royalties—so the Agreement does not want for mutuality as TP argues. As HMG persuasively notes, TP's authorities deal with contracts that failed because they were not exclusive dealings contracts, *e.g.*, *Integrated Micro Sys., Inc.*, 174 Ga. App. at 198, or because they were unilateral, *e.g.*, *Romala Stone, Inc. v. Home Depot U.S.A., Inc.*, No. 1:04-CV-02307-RWS, 2009 WL 900776, at *4 (N.D. Ga. Mar. 30, 2009), *aff'd*, 392 F. App'x 875 (Fed. Cir. 2010).[91] Here, the Agreement does not suffer from those issues.

---

[90]   ECF 1-1, ¶¶ 1.7, 9.1. The Agreement provides for a one-year term, and covers licensing in North America, specifically.

[91]   ECF 107, at 6.

Nevertheless, the Court identifies a dispute of material fact as to whether HMG ordered 500 Firearms, as it claims.[92] HMG points to a purchase order it sent for 500 Firearms on October 11, 2018.[93] TP alleges that HMG never sent it a purchase order after the parties executed the Agreement in January 2019.[94] However, HMG argues that TP's February 4, 2019 invoice acknowledged HMG's pre-Agreement order for 500 Firearms.[95] Further, Woods, TP's President, testified at deposition that he understood that HMG had "already pre-purchased" 500 Firearms from TP,[96] calling into question whether the February 4, 2019 invoice reflects TP's understanding that it was obligated to produce 500 Firearms for HMG per the Agreement.

### b.   TP's Remaining Defenses

TP's remaining contract defenses do not dispose of HMG's breach of contract claim as a matter of law. The Court notes that, for the reasons discussed above, TP's fraud and mistake defenses are precluded, and TP's "unenforceable

---

[92]   ECF 104-1, at 4–8.

[93]   ECF 108-1, at 11–13.

[94]   ECF 104, at 5.

[95]   ECF 83-14.

[96]   ECF 110-1, at 14.

indefinite quantity supply contract" defense fails.[97] TP's defenses of HMG's breach and non-performance, and impossibility of performance remain viable and are subject to a dispute of material fact. Accordingly, HMG's motion for summary judgment is granted in part and denied in part, and TP's cross motion for summary judgment is denied, as to HMG's breach of contract claim.

### ii.   Breach of Confidentiality

TP moves for summary judgment as to HMG's breach of the Agreement's promotional disclosure clause in Paragraph 7.5. It reads:

> **Promotional Disclosures.** True Position shall not issue any press release or public statement regarding this Agreement, and shall not use HMG's name, insignia, trademarks, or any adaptation of them, or the name of any of HMG's investors without the prior written approval of HMG.[98]

HMG alleges that TP created a video without HMG's consent in which it attempted to document its problems with the manufacture of the Firearm in preparation for the parties' mediation prior to this lawsuit.[99] On May 4, 2020, TP uploaded its video to www.vimeo.com, a video hosting and sharing platform,

---

[97]   ECF 94, at 23.

[98]   ECF 1-1, ¶ 7.5.

[99]   ECF 1, ¶ 45.

where it was temporarily available for public viewing.[100] TP avers that, during the two days the video was publicly available, it was viewed 18 times.[101] TP also represents that only subscribers to the videographer's Vimeo page and the parties, counsel, and the mediator who had a link to the video could have viewed it while it was publicly available.[102]

HMG argues that this incident is a per se violation of the Agreement's prohibition on unauthorized promotional disclosures.[103] TP counters that this is not a "promotional disclosure such as a press release or public statement and does not constitute an actionable breach of the Agreement as a matter of law."[104] TP's argument is convincing. Even assuming the video was a public statement or press release, it was not "promotional" in nature. A common dictionary supplies the usual meaning of the word. A video could only be "promotional" if it were

---

[100]  *Id.*

[101]  ECF 104-1, ¶ 12.

[102]  *Id.* at 12–13.

[103]  ECF 107, at 14. HMG claims in its response brief, for the first time, that Paragraph 7.2 of the Agreement was breached. *Id.* The Court declines to consider this argument, as HMG failed to identify this provision in its Complaint [ECF 1, ¶¶ 43–47]. A plaintiff asserting a breach of contract claim must allege and identify a particular contractual provision that the defendant breached. *Am. Casual Dining, L.P. v. Moe's Sw. Grill, L.L.C.*, 426 F. Supp. 2d 1356, 1370 (N.D. Ga. 2006).

[104]  ECF 104-1, at 13.

"intended to advertise something" or "designed to advertising something in order to sell it." *Promotional*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/promotional (last visited Mar. 14, 2022). Because the language is not ambiguous, the Court need not examine it further. *Ainsworth*, 254 Ga. App. at 476. HMG has not established a dispute of material fact as to whether TP's video was promotional, or whether the motion used HMG's "name, insignia, or trademarks."[105] Indeed, HMG does not allege these things at all.

The Court grants TP's summary judgment motion on HMG's breach of confidentiality claim.

## D.    HMG's Tort Claims

TP moves for summary judgment on HMG's remaining claims for tortious interference with contract and conversion. The Court discusses each, in turn.

### 1.    Tortious Interference with Contract

HMG argues that "TP persisted [in refusing to return equipment to HMG] despite HMG's repeated demand . . . to obtain leverage over HMG to recover manufacturing costs," and, in doing so, tortiously interfered "with HMG's efforts to make alternative arrangements to satisfy its outstanding orders . . . for the

---

[105]  ECF 1-1, ¶ 7.5.

Firearm."[106] TP argues that it was not a "stranger to HMG's relationship with its customers," and did not induce any third party to discontinue or fail to enter into a contractual relationship with TP, so it cannot be liable for tortious interference with contract.[107]

> The elements of tortious interference with a contract consist of: (1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of a contractual obligation or caused a party or third party to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

*Culpepper v. Thompson*, 254 Ga. App. 569, 571 (2002).

"Without privilege" means that "the defendant is a stranger to the contract or business relationship." *Slosberg v. Giller*, 341 Ga. App. 581, 584 (2017) (citation omitted). "One must be both a stranger to the contract at issue and the business relationship giving rise to the underpinning contract. . . . In other words, all part[ies] to an interwoven contractual arrangement are not liable for tortious interference with any of the contracts or business relationships." *Brooks v. Branch*

---

106   ECF 107, at 19–20.

107   ECF 104-1, at 17–18.

*Banking & Tr. Co.*, 107 F. Supp. 3d 1290, 1300 (N.D. Ga. 2015) (quoting *Atlanta Mkt.*

*Ctr. Mgmt., Co. v. McLane*, 269 Ga. 604, 609 (1998)). Put differently,

> Where appropriate circumstances appear from the evidence that a defendant had a legitimate interest in either the contract or a party to the contract, the defendant is not a stranger to the contract, although the defendant is a non-signer of a particular contract[, it is not] a stranger to the contract itself or to the business relationship giving rise thereto and underpinning [the contract].

*Id.* (quoting *Disaster Servs., Inc. v. ERC P'ship*, 228 Ga. App. 739, 741 (1997)).

Here, it is undisputed that the parties agreed that TP would receive a royalty for each Firearm HMG sold. Indeed, HMG relies on that fact in its effort to underscore the Agreement's enforceability as an exclusive dealings contract.[108] HMG's customers, HMG, and TP are therefore part of the same "interwoven contractual relationship." *Brooks*, 107 F. Supp. 3d at 1300. Accordingly, TP is not a stranger "without privilege" to HMG's individual sales contracts, *Slosberg*, 341 Ga. App. at 584, and it cannot be held liable for tortious interference with those contracts.

---

[108]  ECF 107, at 3 ("The Agreement grants TP an exclusive, royalty bearing license to manufacture the Firearm.").

TP's summary judgment motion is granted as to HMG's tortious interference claim.

### 2.   Conversion

HMG asserts that TP converted and "steadfastly refused to return the machines, materials, parts, and tools" HMG provided for the manufacture of the Firearm.[109] TP argues that it is entitled to summary judgment on this claim because HMG has not established a dispute of material fact as to damages.[110] In response, HMG contends that the conversion was complete "[a]fter HMG demanded return of its property, [and] counsel for TP sent HMG a letter . . . stating that TP would only return the property if HMG paid TP nearly $1 million dollars."[111]

To establish a prima facie case for conversion, a plaintiff must show: "(1) title to the property or the right of possession, (2) actual possession in the other party, (3) demand for return of the property, and (4) refusal by the other party to return the property." *Hadley v. Bank of Am., N.A.*, No. 1:17-CV-1522-TWT-LTW, 2018 WL 4656426, at *14 (Aug. 27, 2018) (citing *Bo Phillips Co., Inc. v. R.L. King*

---

[109]   ECF 1, ¶¶ 70–75.

[110]   ECF 104-1, at 21.

[111]   ECF 107, at 21.

*Props.*, 336 Ga. App. 705, 707 (2016)), *report and recommendation adopted*, 2018 WL 4636629 (N.D. Ga. Sept. 26, 2018).

As an initial matter, TP's argument that "HMG did not sustain damages from any alleged conversion of parts" fundamentally misunderstands the law.[112] Proof of actual damages is not an element of a conversion claim. *Dierkes v. Crawford Orthodontic Care*, P.C., 284 Ga. App. 96, 99 (2007). The law assumes general damages, those that "flow from a tortious act and may be awarded without proof of any specific amount to compensate plaintiff for the injury done him," from the invasion of a property right. *Id.* (quoting *Callahan v. Panfel*, 195 Ga. App. 891, 893 (1990)).

Regarding the elements of conversion, HMG maintains that it had the right to possess certain "machines, materials, parts, and tools it . . . provided to TP,"[113] and that it demanded the return of the property before it filed suit.[114] In an attempt to undercut HMG's position, TP implicitly concedes HMG's right to possess at

---

[112]  *Id.* at 22.

[113]  ECF 1, ¶ 72.

[114]  *Id.* ¶ 73; ECF 107, at 22 ("After HMG demanded return of its property, counsel for TP sent a letter . . . stating that TP would only return the property if HMG paid TP nearly $1 million dollars."); ECF 17-3, ¶ 58 ("HMG has repeatedly demanded the return of its machines, materials, tools, and parts (and/or access to obtain them.")).

least some of the property, as it avers that it "demanded that HMG retrieve its machinery and raw materials (extrusions) from TP's premises."

But a closer look at the parties' correspondence muddies the water. Hill Redwine, founder and co-owner of HMG, requested TP's "inventory of completed firearms . . . suitable for commercial sale" on February 10, 2020.[115] On February 26, TP's counsel indicated that, "[u]pon payment of $994,863.20, [TP] would be happy to allow [HMG] to collect its parts and do with them as it may wish."[116] It is clear from the correspondence that TP held some of what it considered to be HMG's property as leverage to extract payment, and that, contrary to TP's allegations, it was not "at all relevant times willing to return those items" to HMG unconditionally.[117] So, TP cannot rebut the "refusal" element of conversion as a matter of law. There also exists material disputes of fact concerning the import and breadth of HMG's demand and right to control the property at issue, notwithstanding damages questions that must be answered at trial.

TP's summary judgment motion as to HMG's conversion claim is denied.

---

[115]  ECF 96-12, at 1.

[116]  *Id.* at 5.

[117]  ECF 104-1, at 23.

E.     **HMG's Claims for Injunctive Relief, Punitive Damages, and Attorney's Fees**

Neither HMG nor TP move for summary judgment with respect to HMG's remaining claims for injunctive relief, punitive damages, and attorney's fees. The Court's previous Order granting HMG's preliminary injunction remains in effect,[118] and the Court will not *sua sponte* address injunctive relief, especially in light of HMG's viable claims for breach of contract and conversion. Further, because some of HMG's substantive claims remain, its derivative claims for punitive damages and attorney's fees are viable to the extent that they are based on the remaining contract and tort claims. *Taylor v. Powertel, Inc.*, 250 Ga. App. 356, 357 (2001) (citing O.C.G.A. § 51-12-5.1) ("[P]unitive damages are recoverable where such torts [as conversion] can be proven and the statutory requirements have been satisfied for such damages."); *Kammerer Real Estate Holdings*, 302 Ga. at 287 (noting that a claim for attorney's fees is derivative of a plaintiff's substantive claims); *Racette v. Bank of Am., N.A.*, 318 Ga. App. 171, 181 (2012) (noting that a claim for punitive damages is derivative of a plaintiff's substantive claims).

---

[118] ECF 45.

**IV.    Conclusion**

The parties' objections [ECF 103; ECF 106; ECF 116] are **DENIED**. The parties' summary judgment motions [ECF 83; ECF 104] are each **GRANTED IN PART AND DENIED IN PART**.

HMG shall be permitted to proceed to trial on its claims for breach of contract (although not the breach of confidentiality provision), conversion, injunctive relief, punitive damages, and attorney's fees and costs. TP shall be permitted to proceed to trial on its counterclaims for breach of contract, attorney's fees, and costs.

The parties are **DIRECTED** to file a proposed consolidated pretrial order within 30 days of the entry of this Order.

**SO ORDERED** this 28th day of March, 2022.

Steven D. Grimberg
United States District Court Judge